**Slip Op. 03-115**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                        :
NMB SINGAPORE LTD. and                  :
PELMEC INDUSTRIES (PTE) LTD.;           :
NSK-RHP EUROPE LTD., RHP BEARINGS LTD.  :
and NSK BEARINGS EUROPE LTD.;           :
SKF USA INC., SKF INDUSTRIE S.p.A.,     :
SKF FRANCE S.A., SARMA and SKF GmbH;    :
NTN BEARING CORPORATION OF AMERICA,     :
AMERICAN NTN BEARING MANUFACTURING      :
CORPORATION, NTN BOWER CORPORATION,     :
NTN DRIVESHAFT INCORPORATED,            :
NTN-BCA CORPORATION and                 :
NTN CORPORATION,                        :
                                        :
             Plaintiffs,                :
                                        :
             and                        :
                                        :
THE BARDEN CORPORATION (U.K.) LIMITED   :   Consol. Court No.
and THE BARDEN CORPORATION;             :   00-07-00373
FAG ITALIA S.p.A.,                      :
FAG KUGELFISCHER GEORG SCHAFER AG and   :
FAG BEARINGS CORPORATION,               :
                                        :
             Plaintiff-Intervenors,     :
                                        :
             v.                         :
                                        :
UNITED STATES,                          :
                                        :
             Defendant,                 :
                                        :
             and                        :
                                        :
TIMKEN U.S. CORPORATION,                :
                                        :
             Defendant-Intervenor.      :
_____:


     This consolidated action concerns the claims raised by
plaintiffs, NMB Singapore Ltd. and Pelmec Industries (PTE) Ltd.
(collectively "NMB"), NSK-RHP Europe Ltd., RHP Bearings Ltd. and

NSK Bearings Europe Ltd. (collectively "NSK-RHP"), SKF USA Inc., SKF Industrie S.p.A., SKF France S.A., SARMA and SKF GmbH (collectively "SKF"), NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Bower Corporation, NTN Driveshaft Incorporated, NTN-BCA Corporation and NTN Corporation (collectively "NTN"), and plaintiff-intervenors, The Barden Corporation (U.K.) Limited, The Barden Corporation, FAG Italia S.p.A., FAG Kugelfischer Georg Schafer AG and FAG Bearings Corporation (collectively "FAG"), who move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the United States International Trade Commission's ("Commission" or "ITC") five-year sunset review final determination, entitled <u>Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom</u>, 65 Fed. Reg. 39,925 (June 28, 2000), in which the ITC found <u>inter alia</u> that "revocation of the antidumping duty orders on . . . [ball] bearings from . . . France, Germany, Italy, Japan, Singapore, and the United Kingdom would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time." The Commission's complete determination was published in <u>Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom</u> ("<u>Final Determination</u>"), Inv. Nos. AA1921-143, 731-TA-341, 731-TA-343-345, 731-TA-391-397, and 731-TA-399 (Review), USITC Pub. 3309 (June 2000).

Specifically, NMB contends that the ITC erred in: (1) cumulating the subject imports from Singapore with other subject imports; and (2) determining that revocation of the antidumping duty orders with respect to subject imports would likely lead to continuation or recurrence of material injury.

NSK-RHP contends that the ITC erred in: (1) not treating aerospace drive path bearings as a separate like product from ball bearings; (2) cumulating the subject imports from the United Kingdom with other subject imports; and (3) determining that revocation of the antidumping duty orders with respect to subject imports would likely lead to continuation or recurrence of material injury.

SKF contends that the ITC erred in: (1) cumulating the subject imports from France, Germany, and Italy with other subject imports; and (2) determining that revocation of the antidumping duty orders with respect to subject imports would likely lead to continuation or recurrence of material injury.

NTN contends that the ITC erred in: (1) not treating wheel hub units as a separate like product from ball bearings; (2) not treating aerospace drive path bearings as a separate like product from ball bearings; (3) cumulating the subject imports from Japan with other subject imports; (4) determining the conditions of competition in the domestic ball bearing industry; and (5) determining that revocation of the antidumping duty orders with respect to subject imports would likely lead to continuation or recurrence of material injury.

FAG contends that the ITC erred in cumulating the subject imports from Italy and the United Kingdom with other subject imports.

**Held:** NMB's, SKF's and FAG's 56.2 motions are granted.  NSK-RHP's and NTN's 56.2 motions are granted in part and denied in part.  This case is remanded to the Commission to:  (1) explain how commodity-like the Commission deems the other antifriction bearings; and (2)(a) apply this Court's finding as to the meaning of the term "likely" in determining, pursuant to 19 U.S.C. § 1675a(a)(7) (1994), whether to cumulate subject imports of ball bearings from France, Germany, Italy, Japan, Singapore and the United Kingdom, (b) reconcile the error alleged by NMB with respect to NMB's sister company, if the Commission utilizes NMB's sister company in the Commission's cumulation determination, and (c) apply this Court's finding as to the meaning of the term "likely" in determining, pursuant to 19 U.S.C. § 1675a(a)(1) (1994), whether revocation of antidumping duty orders on ball bearings from France, Germany, Italy, Japan, Singapore and the United Kingdom would likely lead to continuation or recurrence of material injury.

[NMB's, SKF's and FAG's 56.2 motions are granted.  NSK-RHP's and NTN's 56.2 motions are granted in part and denied in part.  Case remanded.]

Dated:    September 3, 2003

White & Case LLP (Walter J. Spak, Christopher F. Corr, Richard J. Burke, Lyle B. Vander Schaaf, Lynn H. Fabrizio and Frank H. Morgan) for NMB, plaintiffs.

Crowell & Moring LLP (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for NSK-RHP, plaintiffs.

Steptoe & Johnson LLP (Herbert C. Shelley, Alice A. Kipel, David N. Tanenbaum and Mary T. Mitchell) for SKF, plaintiffs.

Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano, David G. Forgue and Shannon N. Rickard) for NTN, plaintiffs.

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Max F. Schutzman, Andrew B. Schroth, Mark E. Pardo and Adam M. Dambrov) for FAG, plaintiff-intervenors.

Lyn M. Schlitt, General Counsel; James M. Lyons, Deputy General Counsel, Office of the General Counsel, United States International Trade Commission (Mary Elizabeth Jones and Andrea C. Casson) for the United States, defendant.

Stewart and Stewart (Terence P. Stewart, Geert De Prest, Amy A. Karpel and Lane S. Hurewitz) for Timken U.S. Corporation, defendant-intervenor.[1]

## OPINION

**TSOUCALAS**, **Senior Judge**:    This consolidated action concerns the claims raised by plaintiffs, NMB Singapore Ltd. and Pelmec Industries (PTE) Ltd. (collectively "NMB"), NSK-RHP Europe Ltd., RHP Bearings Ltd. and NSK Bearings Europe Ltd. (collectively "NSK-RHP"), SKF USA Inc., SKF Industrie S.p.A., SKF France S.A., SARMA and SKF GmbH (collectively "SKF"), NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Bower Corporation, NTN Driveshaft Incorporated, NTN-BCA Corporation and NTN Corporation (collectively "NTN"), and plaintiff-intervenors, The Barden Corporation (U.K.) Limited, The Barden Corporation, FAG

---

[1]  In a letter, dated February 28, 2003, Stewart and Stewart advised the Court that The Torrington Company was acquired by The Timken Company, and is now known as Timken U.S. Corporation.  The Court will refer to the defendant-intervenor as Timken in this action.

Italia S.p.A., FAG Kugelfischer Georg Schafer AG and FAG Bearings Corporation (collectively "FAG"), who move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the United States International Trade Commission's ("Commission" or "ITC") five-year sunset review final determination, entitled Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 65 Fed. Reg. 39,925 (June 28, 2000), in which the ITC found inter alia that "revocation of the antidumping duty orders on . . . [ball] bearings from . . . France, Germany, Italy, Japan, Singapore, and the United Kingdom would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time."  The Commission's complete determination was published in Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom ("Final Determination"), Inv. Nos. AA1921-143, 731-TA-341, 731-TA-343-345, 731-TA-391-397, and 731-TA-399 (Review), USITC Pub. 3309 (June 2000).

Specifically, NMB contends that the ITC erred in: (1) cumulating the subject imports from Singapore with other subject imports; and (2) determining that revocation of the antidumping duty orders with respect to subject imports would likely lead to continuation or recurrence of material injury.

NSK-RHP contends that the ITC erred in: (1) not treating aerospace drive path bearings as a separate like product from ball bearings; (2) cumulating the subject imports from the United Kingdom with other subject imports; and (3) determining that revocation of the antidumping duty orders with respect to subject imports would likely lead to continuation or recurrence of material injury.

SKF contends that the ITC erred in: (1) cumulating the subject imports from France, Germany, and Italy with other subject imports; and (2) determining that revocation of the antidumping duty orders with respect to subject imports would likely lead to continuation or recurrence of material injury.

NTN contends that the ITC erred in: (1) not treating wheel hub units as a separate like product from ball bearings; (2) not treating aerospace drive path bearings as a separate like product from ball bearings; (3) cumulating the subject imports from Japan with other subject imports; (4) determining the conditions of competition in the domestic ball bearing industry; and (5) determining that revocation of the antidumping duty orders with respect to subject imports would likely lead to continuation or recurrence of material injury.

FAG contends that the ITC erred in cumulating the subject imports from Italy and the United Kingdom with other subject imports.

## BACKGROUND

In May 1989, the ITC determined that an industry in the United States was being materially injured as a result of less than fair value ("LFTV") imports of ball bearings from France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom ("Original Determination"), Inv. Nos. 303-TA-19 and 20 (Final) and 731-TA-391-399 (Final), USITC Pub. 2185 (May 1989). The Department of Commerce ("Commerce") subsequently published antidumping duty orders covering the subject merchandise from the aforementioned countries on May 15, 1989. See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany, 54 Fed. Reg. 20,900; Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, Spherical Plain Bearings, and Parts Thereof From France, 54 Fed. Reg. 20,902; Antidumping Duty Orders: Ball Bearings and Cylindrical Roller Bearings, and Parts Thereof From Italy, 54 Fed. Reg. 20,903; Antidumping Duty Orders: Ball Bearings,

Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan, 54 Fed. Reg. 20,904; Antidumping Duty Order: Ball Bearings and Parts Thereof From Romania, 54 Fed. Reg. 20,906; Antidumping Duty Order of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Singapore, 54 Fed. Reg. 20,907; Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Parts Thereof From Sweden, 54 Fed. Reg. 20,907; and Antidumping Duty Orders and Amendments to the Final Determinations of Sales at Less Than Fair Value: Ball Bearings, and Cylindrical Roller Bearings and Parts Thereof From the United Kingdom, 54 Fed. Reg. 20,910.

On April 1, 1999, the Commission instituted five-year sunset reviews pursuant to 19 U.S.C. § 1675(c) (1994) to determine whether revocation of antidumping duty orders on certain bearings, including ball bearings from France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, would likely lead to continuation or recurrence of material injury. See Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 64 Fed. Reg. 15,783 (April 1, 1999). On July 2, 1999, the Commission determined that it would conduct full reviews.[2] See Certain Bearings From

---

[2] In a five-year review, the ITC may conduct a full review or an expedited review. A full review includes a public hearing, the issuance of questionnaires, and other procedures, whereas an
(continued...)

China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 64 Fed. Reg. 38,471 (July 16, 1999). A revised notice regarding scheduling and a public hearing was published on December 1, 1999. See Certain Bearings From China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 64 Fed. Reg. 67,304 (December 1, 1999). The Commission held a hearing on March 21, 2000. See Final Determination, USITC Pub. 3309, Vol. 1 at 2.

The Commission cumulated subject imports from France, Germany, Italy, Japan, Singapore and the United Kingdom,[3] see id. at 33, and

--------

[2](...continued)
expedited review does not encompass such procedures. See 19 C.F.R. §§ 207.60(b)-(c) & 207.62(c)-(d) (1999).

[3] During the issuance of Final Determination, USITC Pub. 3309, the Commission was comprised of Chairman Koplan, Vice Chairman Okun and Commissioners Bragg, Miller, Hillman and Askey. Vice Chairman Okun, however, did not participate in the review. See Final Determination, USITC Pub. 3309, Vol. 1 at 1. Commissioner Bragg "cumulatively analyzed the likely effects of revocation of the orders on [ball bearings] from all eight subject countries" (that is, France, Germany, Italy, Japan, Singapore, the United Kingdom, Romania and Sweden). See Final Determination, USITC Pub. 3309, Vol. 1, Separate and Dissenting Views of Commissioner Lynn M. Bragg ("Bragg's Views") at 70. Commissioner Miller cumulated the imports of the subject merchandise from France, Germany, Italy, Japan, Romania, Singapore, and the United Kingdom. See Final Determination, USITC Pub. 3309, Vol. 1, Separate and Dissenting Views of Commissioner Marcia E. Miller ("Miller's Views") at 90. Commissioner Hillman does not cumulate ball bearings from Singapore with those from France, Germany, Italy, Japan and the United Kingdom. See Final Determination, USITC Pub. 3309, Vol. 1, Separate and Dissenting Views of Commissioner Jennifer A. Hillman ("Hillman's Views") at 105. Commissioner Askey does not cumulate
(continued...)

in June 2000, voted that revocation of the antidumping duty orders on the subject merchandise from those countries would likely lead to continuation or recurrence of material injury within a reasonably foreseeable time.[4] See id. at 52. Plaintiffs inter alia challenge the Commission's cumulation as well as the Commission's affirmative determination upon cumulation. On

---

[3](...continued)
the subject imports from Sweden, Romania, the United Kingdom and France, but cumulates the subject imports from Germany, Italy, Japan and Singapore. See Final Determination, USITC Pub. 3309, Vol. 1, Concurring and Dissenting Views of Commissioner Thelma J. Askey ("Askey's Views") at 129-34.

[4] Commissioner Hillman determined that revocation of the antidumping duty order on ball bearings from Singapore would not likely lead to continuation or recurrence of material injury within a reasonably foreseeable time. See Final Determination, USITC Pub. 3309, Vol. 1 at 52 n.394; see also Final Determination, USITC Pub. 3309, Vol. 1, Hillman's Views at 106. Commissioner Askey concurred that revocation of the antidumping duty order on ball bearings from France would likely lead to continuation or recurrence of material injury within a reasonably foreseeable time but dissented with respect to ball bearings from Germany, Italy, Japan, Singapore, and the United Kingdom. See Final Determination, USITC Pub. 3309, Vol. 1 at 52 n.396; see also Final Determination, USITC Pub. 3309, Vol. 1, Askey's Views at 136-43. Chairman Koplan, Commissioner Bragg and Commissioner Miller voted in favor of not revoking the antidumping duty orders on ball bearings from France, Germany, Italy, Japan, Singapore and the United Kingdom. See Final Determination, USITC Pub. 3309, Vol. 1 at 52. Commissioner Bragg clarified her affirmative determination via footnotes added to the ITC's opinion. See Final Determination, USITC Pub. 3309, Vol. 1 at 39-42; See also Final Determination, USITC Pub. 3309, Vol. 1, Bragg's Views at 68-70.

The Court notes that the Commission's determination "that revocation of the antidumping duty orders on [ball bearings] from Romania and Sweden would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time[]" is not at issue in this case. Final Determination, USITC Pub. 3309, Vol. 1 at 52.

November 3, 2000, this Court granted NMB's motion for preliminary injunction.  An oral argument was held before this Court on October 10, 2001.  Additionally, this Court on August 2, 2002, granted NSK-RHP's motion for preliminary injunction.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2000) and 28 U.S.C. § 1581(c) (2000).

**STANDARD OF REVIEW**

The Court will uphold the Commission's final determination in a full five-year sunset review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of America v. United States, 24 CIT 385, 389-90, 104 F. Supp. 2d 110, 115-16 (2000) (detailing the Court's standard of review for agency determinations).  "'Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "[T]he possibility of drawing two inconsistent conclusions from the [same] evidence does not" preclude the Court

from holding that the agency finding is supported by substantial evidence. Consolo v. Federal Mar. Comm'n, 383 U.S. 607, 620 (1966). An agency determination will not be "overturned merely because the plaintiff 'is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination.'" Torrington Co. v. United States, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990)(internal citation omitted), aff'd, 938 F.2d 1276 (Fed. Cir. 1991).

Additionally, to determine whether the Commission's interpretation and application of a statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under the first step, the Court reviews the Commission's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter." Id. (citations omitted). Beyond the statute's text, the

tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations omitted); but see Floral Trade Council v. United States, 23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether the Commission's construction of the statute is permissible. See Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of the Commission's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided the Commission has acted rationally, the Court may not substitute its judgment for the agency's. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); see also IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United States, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether the

Commission's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole.  See Mitsubishi Heavy Indus. v. United States, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

## DISCUSSION

**I.    The Commission's Like Product Determination**

   **A.    Statutory Background**

In a five-year review, the ITC determines whether revocation of an antidumping duty order would likely "lead to continuation or recurrence of dumping . . . [and] material injury."  19 U.S.C. § 1675(c)(1).  "To determine whether an industry in the United States is materially injured or threatened with material injury by reason of imports of the subject merchandise, the ITC must first define the 'domestic like product' and the 'industry' producing the product."  Chefline Corp. v. United States, 25 CIT ___, ___, 170 F. Supp. 2d 1320, 1325 (2001).  Title 19, United States Code, § 1677(10) defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."  19 U.S.C. § 1677(10) (1994).  Section 1677(4)(A) of Title 19 defines "industry" as "the producers as a whole of a domestic like product,

or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A) (1994). In defining the "like product," the Commission typically considers: (1) physical characteristics and uses; (2) interchangeability of the products; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) the use of common manufacturing facilities and personnel; and (6) price. See Timken v. United States, 20 CIT 76, 80, 913 F. Supp. 580, 584 (1996) (citing Aramide Maatschappij V.O.F. v. United States, 19 CIT 884, 885 (1995); Calabrian Corp. v. United States, 16 CIT 342, 346 n.4, 797 F. Supp. 377, 382 n.4 (1992); Torrington Co. v. United States, 14 CIT 648, 652, 747 F. Supp. 744, 749 (1990), aff'd, 938 F.2d 1278 (1991)). "The Commission generally disregards minor differences, and looks for clear dividing lines between like products." Nippon Steel Corp. v. United States, 19 CIT 450, 455 (1995).

Moreover, in its Rules of Practice and Procedure regarding sunset reviews, the Commission has stated:

> In appropriate circumstances, the Commission may revisit its original domestic like product . . . determination[] in five-year reviews. For example, the Commission may revisit its like product determination when there have been significant changes in the products at issue since the original investigation or when domestic like product definitions differed for individual orders within a group concerning similar products.

63 Fed. Reg. 30,599, 30,602 (June 5, 1998); See also 19 U.S.C. §

1675a(a)(1)(A) (1994).


B.    Commission Findings

"The Commission began its like product determination by reviewing the findings made in the Original Determination." Def. U.S. ITC's Mem. Opp'n Pls.' Mot. J. Agency R. (Def.'s Mem.) at 13.


1.    Original Determination

In the Original Determination, the ITC "determine[d], consistent with [its] preliminary determination, that there [were] separate like products, within antifriction bearings generally, based upon the type of rolling element employed." Original Determination, USITC Pub. 2185 at 16. The ITC found "six separate like products: (1) ball bearings[;] (2) spherical roller bearings[;] (3) cylindrical roller bearings[;] (4) needle roller bearings[;] (5) spherical plain bearings[;] and (6) slewing rings." Id. at 33. Additionally, the Commission rejected arguments to treat wheel hub units and aerospace drive path ("ADP") ball bearings as separate like products. See id. at 20-25. In particular, with respect to wheel hub units, the Commission stated:

> [The Commission] determine[d] that wheel hub units are not a separate like product. They are not significantly different from other ball bearings, especially other housed and mounted ball bearings, in terms of functional characteristics and applications. In addition, like other housed bearings, if the bearing in a wheel hub unit wears out, the entire unit must be

replaced.  Thus the unit itself is inseparable from its bearing functions.  Moreover, none of the respondents agree as to the definition of this allegedly separate like product.  Some make no distinction among the generations of wheel hub units, others define the product as generations 2 and 3, and still others define it as just generation 3.  Such definitional vagueness was fatal, in [the Commission's] view, to the evaluation of other candidates for separate like product treatment, such as "aerospace" bearings, and is similarly fatal here. . . .  [The Commission] include[s] wheel hub units in the like product category corresponding to the type of rolling element employed therein. Specifically, in these investigations, they are ball bearings.

Original Determination, USITC Pub. 2185 at 21-22 (citations omitted).  With respect to ADP bearings, the Commission stated:

[The Commission] determine[d] that "aerospace" bearings, however defined, do not constitute a separate like product.  Like product distinctions based solely upon end use are suspect, at least in investigations involving intermediate products such as bearings, in which there are literally thousands of separate products, none of which can be substituted for another in their specific applications.  The use of high quality raw materials, extensive documentation of the production process to facilitate traceability, and technologically advanced production methods are common to all superprecision bearings and, thus, does not distinguish aerospace bearings from other superprecision bearings that are not consumed by the aerospace industry.

Original Determination, USITC Pub. 2185 at 24 (citations and emphasis omitted).

### 2.    Final Determination: Wheel Hub Units

During the five-year review at issue, NTN "advocated in response to the notice of institution and in [NTN's] prehearing brief that the Commission treat wheel hub units as a separate like

product."   Final Determination, USITC Pub. 3309, Vol. 1 at 8
(citations omitted); see also Def.'s Mem., App. Vol. 1, Doc. No.
129 (NTN's Response to the Notice of Institution) at 23-24 and Doc.
No. 602 (NTN's Prehearing Brief) at 10-13.   In the Final
Determination, the Commission stated that "[t]he Commission in its
1989 determination [that is, Original Determination, USITC Pub.
2185 at 20-22] on antifriction bearings other than [tapered roller
bearings] considered and rejected arguments that wheel hub units
should be carved out as a separate like product from the general
category of [ball bearings]."   Final Determination, USITC Pub.
3309, Vol. 1 at 8 (citation omitted).


### 3.   Final Determination: ADP Bearings

Additionally, during the five-year review at issue, "[s]everal
parties argue[d] throughout these reviews that aerospace drive path
. . . ball bearings . . . comprise separate like products."  Final
Determination, USITC Pub. 3309, Vol. 1 at 8.   In particular, the
parties argued that "the Commission in its [Original Determination,
USITC Pub. 2185 at 22-25] did not consider the like product issue
with respect to the narrow category of ADP bearings as defined in
the Commission's questionnaires and that the prevalent use today of
specialty steels to make ADP bearings is a major development since
the   orders   were   imposed."    Id.   at   9   (citation   omitted).
Subsequently,   the   ITC   considered   whether   ADP   ball   bearings

constituted a separate like product and determined:

> [The Commission] do[es] not find that ADP bearings comprise a separate domestic like product. While the record indicates some differences in physical characteristics, end uses, interchangeability, price, and facilities between ADP bearings and other [ball bearings] . . ., [the Commission] find[s] that the similarities outweigh these differences. The record shows that the special materials and special machinery and facilities used to produce ADP bearings are also used in the production of other highly specialized bearings and that other types of precision and non-precision bearings may command prices as high as those for ADP bearings. With respect to interchangeability, all bearings, and not ADP bearings in particular, are only interchangeable with other bearings on a parts number basis. Customer perception is of limited use in distinguishing ADP bearings as a separate product category, given that purchasers typically buy all types of bearings by part number and are familiar only with the specifications of the particular products they purchase. In addition, while ADP bearings are sold only to OEMs [original equipment manufacturers], so is the majority of [United States] producers' sales of non-ADP ball . . . bearings, with [United States] producers shipping 79.1 percent of their [United States] [ball bearing] shipments . . . to OEMs. In cases such as the present one, where the domestically manufactured merchandise is made up of a continuum of similar products, [the Commission] normally do[es] not consider each item of merchandise to be a separate domestic like product that is only "like" its counterpart in the scope, but consider[s] the continuum itself to constitute the domestic like product. Given the "continuum" nature of bearings, then, [the Commission] conclude[s] that there is no clear dividing line between ADP bearings and all other types of bearings.

Final Determination, USITC Pub. 3309, Vol. 1 at 12-13 (citations

omitted).

### C.    Analysis

#### 1.    Contentions of the Parties: Wheel Hub Units

NTN contends that the "ITC erred when it failed to treat wheel hub units as separate like products from ball bearings." Pl. NTN's Mot. and Mem. Supp. J. Agency R. (NTN's Mot.) at 69.  In particular, NTN argues that the Commission "failed to provide any discernible reasoning whatsoever for [its] decision [not to treat wheel hub units as separate like products from ball bearings], and failed to address the record evidence presented in this review." Id. at 69-70.  Relying on Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), NTN maintains that the Commission's Final Determination "violates the mandate that agencies 'articulate a rational connection between the facts found and the choice made.'" NTN's Mot. at 70; see also id. at 70-71 (citing Taiwan Semiconductor Indus. Ass'n v. United States, 23 CIT 410, 418, 59 F. Supp. 2d 1324, 1332 (1999), aff'd, 266 F.3d 1339 (Fed. Cir. 2001), reh'g denied, 2001 U.S. App. LEXIS 27637, * (Fed. Cir. Dec. 4, 2001); Asociacion Colombiana de Exportadores de Flores v. United States, 12 CIT 1174, 1177, 704 F. Supp. 1068, 1071 (1988); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167-68 (1962)).  Moreover, NTN asserts that although the Commission cited to the Original Determination in the Commission's Final Determination, the Commission "does not indicate that the findings from [the Original Determination] apply to the separate

facts of the record for [the] investigation" at bar, that is, the Final Determination.  NTN's Mot. at 71 (citing Acciai Speciali Terni v. United States, 24 CIT 1064, 1080, 118 F. Supp. 2d 1298, 1312-13 (2000), dismissed, 2001 U.S. App. LEXIS 1651, *, (Fed. Cir. Jan. 23, 2001).  NTN, therefore, requests that this Court remand this issue to the ITC with instructions "that the ITC provide a rationale for its failure to treat wheel hub units as separate like products from ball bearings."  NTN's Mot. at 71.

Next, NTN argues that the record evidence indicates that wheel hub units should be treated as separate like products from ball bearings because: (1) "wheel hub units have significantly different physical characteristics and end uses from ball bearings . . . [that is,] the incorporation of a hub onto which wheels are mounted, special heat treating, low carbon steel as a raw input, and in some cases splined inner rings[,]" id. at 73 (citing Pl. NTN's Pub. Appendices Mot. and Mem. Supp. J. Agency R. ("NTN's App.") 9 (NTN's Prehearing Brief) at 10-11); (2) "regarding interchangeability, . . . because of their unique construction and unique application, no other bearing product can be substituted for a wheel hub unit[,]" NTN's Mot. at 73 (citing NTN's App. 9 at 11); (3) "[r]egarding the channels of distribution utilized for wheel hub units, . . . [w]heel hub units are sold essentially only to original equipment manufacturers . . . , and are typically sold

through the automotive parts division, rather than general sales divisions . . . and . . . typically do not even appear in general bearing catalogs[,]" NTN's Mot. at 73-74 (citing NTN's App. 9 at 11-12); (4) "regarding the production facilities, processes, and employees used in the production of wheel hub units, . . . the production process [for wheel hub units] is significantly different from the process for ball bearings[,]" NTN's Mot. at 74 (citing NTN's App. 9 at 12); and (5) "wheel hub units are priced completely different from ball bearings." Id.

Finally, NTN contends that the Commission drew an unjustified adverse inference because NTN failed to address the like product treatment of wheel hub units at the hearing or in NTN's posthearing brief. See NTN's Mot. at 74-76. NTN maintains that: (1) NTN's Response to the Notice of Institution and prehearing brief "are documents on the record for this matter[,]" id. at 72 (citing 19 U.S.C. § 1516a(b)(2)(A) (1994) and Acciai, 24 CIT at 1071, 118 F. Supp. 2d at 1305); (2) "the hearing, which was scheduled for one day only, included over 30 filed appearances in support of revocation alone, and very strict time limits on the presentation of information[,]" NTN's Mot. at 75; and (3) "19 C.F.R. § 201.13(i)(1) (1996) clearly indicates that 'information produced at the hearing and arguments thereon may be presented to the Commission . . . ' in post-hearing briefs. Therefore, because NTN

was unable to raise this issue at the hearing, it was also unable to raise the issue in its post-hearing brief." Id.

The Commission responds that the "Commission's determination to include wheel hub units in the domestic like product of ball bearings was supported by substantial evidence and in accordance with law." Def.'s Mem. at 36. Specifically, the Commission asserts that: (1) "the Commission is not required to indicate in its determination that it considered each specific item of evidence[,]" id. at 38 (citing Granges Metallverken v. United States, 13 CIT 471, 478-79, 716 F. Supp. 17, 24 (1989), and Rhone-Poulenc, S.A. v. United States, 8 CIT 47, 55, 592 F. Supp. 1318, 1326 (1984)); (2) "[i]n a five-year review, the Commission does not have an obligation, in the absence of new information, to conduct a re-evaluation of a like product issue that it had considered and resolved in the course of the original review absent substantiated circumstances warranting such a review[,]" Def.'s Mem. at 38 (citing Rules of Practice and Procedure, 63 Fed. Reg. at 30,602); (3) unlike the proponents of a separate like product definition for ADP ball bearings, "NTN did not offer any information to indicate that significant changes in the product [that is, wheel hub units] had occurred, warranting a review of the determination[,]" Def.'s Mem. at 39; and (4) "the Commission had an unambiguous statement from the only domestic producer of wheel hub units that the product

was properly classified as a ball bearing."[5]  Id. (citing Def.'s Mem., App. Vol. 1, Doc. No. 12 at 8 (confidential version)).

Additionally, the Commission responds to NTN's assertion that the Commission drew an adverse inference against NTN since NTN failed to address the like product treatment of wheel hub units at the hearing or posthearing brief by stating that "wheel hub units were mentioned several times by parties in favor of continuation and in favor of revocation . . . [and] [g]iven that a party had raised the topic, respondent NTN could have responded to the 'information produced at the hearing and arguments thereon' in its posthearing brief had it wished to do so."  Def.'s Mem. at 40; see also id. n.155 (citing Def.'s Mem., App. Vol. 1, Doc. No. 710 at 46, 156, 179, 312, 366 and 392).  Moreover, the Commission maintains that NTN fails to point to any evidence that was not available to the Commission in the Original Determination. See Def.'s Mem. at 40.

Timken generally agrees with the Commission and maintains that "NTN's prehearing submission . . . did not identify any post-investigation changes which might have formed a basis for the

---

⁵  NTN replies that "[t]his statement . . . fails to provide any legal basis for the ITC's actions . . . [and] the requirement that the ITC make a decision supported by substantial evidence on the record, as required by 19 U.S.C. § 1516a(b)(1)(B) is not fulfilled by the post hoc reliance on a single statement by a single domestic party."  Pl. NTN's Reply Br. Def. and Def.-Intervenor's Resp. Brs. of May 2, 2001 ("NTN's Reply") at 25.

Commission to revisit its original determination on the issue."
[Timken's] Br. Resp. Pls.' R. 56.2 Mot. J. Agency R. ("Timken's
Resp.") at 70; see also id. at n.25 (citation omitted) ("NTN's
prehearing brief discussion was limited to a review of the six
factor test also used by the Commission in the original
[determination], in support of a determination that wheel hub units
were not a separate like product"). Timken further maintains that
NTN incorrectly cited to 19 C.F.R. § 201.13(i)(1) for NTN's
proposition that since NTN was unable to raise the wheel hub units
issue at the hearing, it was also unable to raise the issue in its
post-hearing brief.[6] See Timken's Resp. at 71-72. Moreover,
Timken argues that NTN's "assertion that the Commission's decision
might be based on adverse inferences against NTN due to [NTN's]
failure to raise the [wheel hub unit] like product issue at the
hearing or in [NTN's] post-hearing brief is baseless" because "the

---

[6] Timken argues that 19 C.F.R. § 207.67 (2000) applies in this
case because "[t]he provision NTN cited [19 C.F.R. § 201.13(i)(1)]
was a general Commission regulation . . . [and] [i]n case of
inconsistency between a rule of general application and a rule of
special application [i.e., 19 C.F.R. § 207.67], the latter is
controlling." Timken's Resp. at 72 n.26 (quoting 19 C.F.R. § 201.1
(2000)). Applying 19 C.F.R. § 207.67, Timken states that "if NTN
had any information warranting a departure from the Commission's
original determination, and the information could not have been
presented in [NTN's] prehearing brief or before, it could still
have been presented in the post-hearing brief." Id. at 72.

NTN responds that "[t]o argue that NTN could have raised the
wheel hub unit issue in its post-hearing brief because the
information was brought forth after the hearing is circular
reasoning and renders [19 C.F.R. § 207.67] meaningless." NTN's
Reply at 26-27.

Commission declined to revisit whether [wheel hub units] constituted a separate like product [since] it had already done so in [the] original [determination] and no evidence suggested that re-examination of the issue was warranted."[7]   Id. at 73.

### 2.   Analysis: Wheel Hub Units

As a preliminary matter, the Court finds that the Commission's explanation (that the Commission did not conduct a re-evaluation of the like product issue with respect to wheel hub units because there was an absence of new information warranting reconsideration) and the Commission's reference to the Rules of Practice and Procedure, 63 Fed. Reg. at 30,602, do not amount to post hoc rationalizations.   See Hoogovens Staal BV v. United States, 24 CIT 44, 60, 86 F. Supp. 2d 1317, 1331 (2000) (holding that "a reviewing court must evaluate the validity of an agency's decision on the basis of the reasoning presented in the decision

---

[7] In its reply brief, NTN argues that the Commission's and Timken's arguments that "the ITC sufficiently stated its rationale for [not treating wheel hub units as separate like products] when the ITC baldly stated that it had reviewed the like product treatment of wheel hub units in [the Original Determination]" and the Commission's and Timken's references to the Rules of Practice and Procedure amount to post hoc rationalizations because "[n]either the [Commission] nor [Timken] is able to point to any language in the [Final Determination] in which the ITC makes the leap from acknowledging that a similar issue was raised in 1989 [that is, the Original Determination] to deciding the issue summarily on the basis of its Rules of Practice and Procedure." NTN's Reply at 24; see also id. at 25.

itself. An agency determination 'cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order . . .'") (quoting SEC v. Chenery Corp., 318 U.S. 80, 94 (1943)); see also Burlington Truck, 371 U.S. at 168-69 ("The courts may not accept . . . counsel's post hoc rationalizations for agency action; . . . an agency's discretionary order [must] be upheld, if at all, on the same basis articulated in the order by the agency itself").[8]

Next, the Court disagrees with NTN that the Commission failed to provide a discernible reasoning for its determination not to treat wheel hub units as separate like products from ball bearings and failed to address the record evidence presented in this review. Pursuant to 19 U.S.C. § 1675a(a)(1)(A), "[t]he Commission shall take into account . . . its prior injury determinations . . . ." "The Commission has interpreted [19 U.S.C.] § 1675a(a)(1)(A) to include its prior like product determinations." Chefline, 25 CIT at ___, 170 F. Supp. 2d at 1326 (citations omitted); see also Rules of Practice and Procedure, 63 Fed. Reg. at 30,602 ("the Commission may revisit its like product determination when there have been significant changes in the products at issue since the original

---

[8] The Court, however, agrees with NTN that the Commission's reference in its brief to "an unambiguous statement from the only domestic producer of wheel hub units that the product was properly classified as a ball bearing[,]" Def.'s Mem. at 39 (citing Def.'s Mem., App. Vol. 1, Doc. No. 12 at 8 (confidential version)) amounts to a post hoc rationalization which the Court will not rely on.

<u>investigation</u>")(emphasis supplied).  Moreover, "a domestic like

product finding in one investigation is not dispositive of another

like product investigation."  <u>Acciai</u>, 24 CIT at 1070, 118 F. Supp.

2d at 1304 (citing <u>Nippon</u>, 19 CIT at 454-55).  However, the Court

in <u>Acciai</u>, 24 CIT at 1071, 118 F. Supp. 2d at 1304-05 further

stated:

> Where . . . the ITC has addressed similar or identical
> facts, no statute or case authority prohibits it from
> drawing upon its previous work in addressing the issue at
> hand. . . . [T]o find otherwise would require the ITC to
> ignore its institutional experience and make each like
> product determination in a vacuum--an impractical
> conclusion which cannot be reasonably endorsed.

In the case at bar, the Commission stated in its <u>Final

Determination</u>:

> NTN . . . advocated in response to the notice of
> institution and in their prehearing brief that the
> Commission treat wheel hub units as a separate like
> product but did not pursue this argument at the hearing
> or afterwards. [Citing NTN's Response to the Notice of
> Institution at 22-24 and NTN's Prehearing Brief at 10-
> 12].  The Commission in its 1989 determination [<u>Original
> Determination</u>] on antifriction bearings other than TRBs
> considered and rejected arguments that wheel hub units
> should be carved out as a separate like product from the
> general category of [ball bearings].

<u>Final Determination</u>, USITC Pub. 3309, Vol. 1 at 8.  Although the

Court agrees with NTN that the <u>Final Determination</u>, USITC Pub.

3309, Vol. 1 at 8, does not contain language "in which the ITC

makes the leap from acknowledging that a similar issue was raised

in [the <u>Original Determination</u>] to deciding the issue summarily on

the basis of its <u>Rules of Practice and Procedure</u>[,]" NTN's Reply at 24, the Court finds that the Commission did provide a discernible reasoning for its determination not to treat wheel hub units as separate like products from ball bearings. <u>See</u> <u>USEC Inc. v. United States</u>, 27 CIT ___, ___, 259 F. Supp. 2d 1310, 1317 (2003) (quoting <u>Bowman Transp.</u>, 419 U.S. at 286 ("the Court may 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned'")). In particular, since NTN failed to provide record evidence warranting a basis for the Commission to revisit its <u>Original Determination</u>, the Commission in its <u>Final Determination</u>, resorted to its <u>Original Determination</u> and decided not to treat wheel hub units as separate like products from ball bearings. Moreover, the Court does not agree with NTN that the Commission failed to address the record evidence presented in this review, particularly since the evidence presented by NTN does not point to a change in the <u>Original Determination</u>. <u>See</u> <u>USEC Inc. v. United States</u>, 2002 U.S. App. LEXIS 7845, **14 (Fed. Cir. 2002) (citing <u>Granges Metallverken</u>, 13 CIT at 478-79, 716 F. Supp. at 24 ("The ITC is not required to explicitly address every piece of evidence presented by the parties, and absent a showing to the contrary, the ITC is presumed to have considered all of the evidence on the record")).

Accordingly, the Court sustains the Commission's decision not to treat wheel hub units as separate like products from ball

bearings.[9]


### 3.   Contentions of the Parties: ADP Bearings

### A.   NSK-RHP's Contentions

NSK-RHP contends that the Commission's determination that ADP ball bearings do not constitute a separate like product is not supported by substantial evidence and is contrary to law. See Mem. P. & A. Supp. NSK-RHP's Mot. J. Agency R. ("NSK-RHP's Mot.") at 4-15, 29-43; Pls.' Reply Mem. Supp. Mot. J. Agency R. ("NSK-RHP's Reply") at 2-19. In particular, NSK-RHP refers to the six factors (physical characteristics and uses, interchangeability, channels of distribution, common manufacturing facilities and personnel, customer and producer perceptions, and price) used by the Commission in defining the "like product" and challenges the Commission's determination regarding each of the six factors. See id.

First, with respect to the physical characteristics and uses factor, NSK-RHP contests the Commission's finding that "the record

---

[9] The Court does not reach NTN's argument that the Commission drew an unjustified adverse inference as a result of NTN's failure to address the like product treatment of wheel hub units at the hearing or in NTN's posthearing brief because as the Court indicates in its analysis above, the Commission in its Final Determination resorted to its Original Determination since NTN failed to provide record evidence warranting a re-evaluation of the Original Determination.

shows that other highly specialized bearings use the same special materials as ADP bearings[,]" NSK-RHP's Mot. at 29, by asserting that: (1) the Commission's finding is unsupported by substantial evidence because in the Final Determination, USITC Pub. 3309, Vol. 1 at 12, the Commission cited to the Commission's staff report which in turn cited to Timken's post-hearing brief that contains mere factual assertions which are not supported by substantial record evidence, see id.; (2) the Commission should have ignored the statements made by Mr. Gridley, Timken's Executive Director for Marketing Services and Government Affairs, because he lacked relevant expertise, see id. at 31; and (3) the testimony of Ms. Demerling, president of a domestic firm that produces ADP ball bearings, was rebutted by two other experts and should have therefore been discounted by the Commission. See id. at 33 n.113 (citing Appendices Mem. P. & A. Supp. NSK-RHP's Mot. J. Agency R. ("NSK-RHP's App.") 3 and 4 (confidential version). According to NSK-RHP, the Commission "gave too much weight to non-evidence, a non-expert, and a discredited expert." NSK-RHP's Mot. at 34.

Second, regarding the interchangeability of the products factor, NSK-RHP contends that ADP bearings and non-ADP bearings are not interchangeable and the Commission abused its discretion when "the Commission acknowledged that ADP bearings were not interchangeable with non-ADP bearings, [citing Final Determination,

USITC Pub. 3309, Vol. 2 at BB-II-4] but then dismissed this finding by stating, 'all ball bearings, and not ADP bearings in particular, are only interchangeable with other bearings on a parts number basis.'" Id. at 38 (quoting Final Determination, USITC Pub. 3309, Vol. 1 at 12). NSK-RHP also points to its Statement of Facts arguing that ADP bearings constitute a separate like product. See NSK-RHP's Mot. at 39; see also id. at 9-11 (citing inter alia NSK-RHP's App. 5, 9 (confidential version)).

Third, with respect to the channels of distribution, NSK-RHP argues that the record evidence "demonstrates that ADP bearing OEM customers, unlike general non-ADP bearing OEM customers, supervise every aspect of ADP bearing production from cradle to grave." NSK-RHP's Mot. at 39; see also id. at 13. NSK-RHP further argues that the record evidence also "proves that the aftermarket otherwise common to non-ADP bearings simply does not exist with respect to ADP bearings, because OEM customers of ADP bearings tightly control the distribution of spare parts." Id. at 39-40; see also id. at 13-14.

Fourth, NSK-RHP argues that the Commission's determination regarding the use of common manufacturing facilities and personnel factor "relies almost exclusively on assertions by counsel for which factual evidence does not exist on the record." Id. at 34 (citing NSK-RHP's App. 11 at 17 (answer to Commissioner Hillman's

question)). NSK-RHP also argues that "[t]he Commission . . . erred when it considered MPB's [that is, a manufacturer of ADP bearings that opposed a separate like product treatment of ADP bearings] uncorroborated assertions and Ms. Demerling's testimony as substantial evidence to support its erroneous conclusion about ADP bearing manufacturing facilities and processes" since "Mr. Ogden . . . testified that MPB's plant . . . is dedicated almost exclusively to ADP bearings." NSK-RHP's Mot. at 35-36. Moreover, NSK-RHP contends that the website information regarding SKF's subsidiary and NSK-RHP's division that was submitted as evidence by the parties opposing that ADP bearings be treated as a separate like product does not support their contentions. See id. at 36. NSK-RHP alleges that its Statement of Facts "proves that substantial evidence on the record supports a finding that bearing companies, including MPB, use separate manufacturing facilities or flow lines to build ADP bearings." Id. at 37; see also id. at 6-9.

Fifth, NSK-RHP asserts that "[t]he Commission abused its discretion when it summarily dismissed the overwhelming factual evidence that customers perceive ADP bearings as a different like product than non-ADP bearings." NSK-RHP's Mot. at 40. NSK-RHP maintains that: (1) "there is no evidence on the record that customers perceive ADP bearings and non-ADP bearings as the same like product[,]" id.; (2) the opponents of a separate like product

treatment for ADP bearings "concede[] that customers perceive ADP bearings to be separate products[,]" id. (citing Final Determination, USITC Pub. 3309, Vol. 1 at 12); and (3) the Commission's view that "customer perception is of limited use because purchasers buy all types of bearings by part number and are familiar only with the specifications of the particular products they purchase[,]" NSK-RHP's Mot. at 41 (citing Final Determination, USITC Pub. 3309, Vol. 1 at 12), is not a credible statement pursuant to Torrington Co., 14 CIT at 654-55, 747 F. Supp. at 751, because unlike a casual observer, the Commission should have realized that "ADP bearing customers are critically aware of the differences between ADP bearings and non-ADP bearings, and their functional capabilities" and "to substitute a non-ADP bearing for an ADP bearing 'would be tantamount to first degree murder.'" NSK-RHP's Mot. at 41 (quoting NSK-RHP's App. 5 at 331); see also NSK-RHP's Mot. at 11-13.

Finally, NSK-RHP argues that "[t]he factual record demonstrates that ADP bearings generally sell on average at prices much higher than the prices for an average non-ADP bearing." Id. at 42; see also id. at 14-15.

### B. NTN's Contentions

NTN argues that the Commission's statement in the Final Determination, that "the parties seeking to have ADP ball bearings treated as a separate like product from ball bearings set forth a clear dividing line between ADP ball bearings and ball bearings based on, 'the use of special steels in fabricating ADP bearings[,]'" misstates the arguments raised by NTN. NTN's Mot. at 77 (quoting Final Determination, USITC Pub. 3309, Vol. 1 at 9). NTN maintains that because of this misstatement, the Commission failed to consider that "several factors, when taken together, created a clear dividing line between ADP ball bearings and ball bearings."[10] NTN's Mot. at 77.

Next, NTN refers to the six factors used by the Commission in defining the "like product" (that is, physical characteristics and uses, interchangeability, channels of distribution, customer and

---

[10] The Commission responds:

> The Commission specifically acknowledged other specialized characteristics of ADP bearings as defined by NTN and others, such as custom-designed housings, extreme operating conditions, custom design, limited interchangeability, and limited end uses. [Citing Final Determination, USITC Pub. 3309, Vol. 1 at 9-13]. The Commission fully understood the proposed product definition and evaluated the product definition advanced by NTN and others.

Def.'s Mem. at 19 n.64.

producer perceptions, common manufacturing facilities and personnel, and price) and challenges the Commission's determination regarding each of the six factors. See NTN's Mot. at 79-90; see also NTN's Reply at 27-34.

First, with respect to the physical characteristics and uses factor, NTN argues that ADP bearings have different physical characteristics and end uses from ball bearings and that the Commission failed to consider certain record evidence relating to this factor. See NTN's Mot. at 79-81. In particular, NTN maintains that contrary to the Commission's findings that non-ADP and ADP bearings have some differences in physical characteristics and the special materials used to produce ADP bearings are also used to produce non-ADP specialized bearings, "there is no other general grouping of ball bearings [other than ADP bearings] in which all of the bearings are made from specialty steel." Id. at 80 (citing NTN's App. 9 at 5). NTN further maintains that ADP bearings are designed solely for certain specifically designed uses and "there is no evidence on the record indicating that ADP ball bearings have any alternate commercial use." NTN's Mot. at 80 (citing NTN's Apps. 12 and 13 (confidential versions)).

Second, with respect to interchangeability, NTN argues that: (1) the Commission's "finding that all bearings are interchangeable on a part number basis is irrelevant to the question of whether ADP

ball bearings and ball bearings are interchangeable" because the question asked by the ITC in a previous ball bearing investigation regarding interchangeability addressed the actual physical characteristics of ball bearings, NTN's Mot. at 81-82 (citing Ball Bearings, Mounted or Unmounted, and Parts Thereof, From Argentina, Austria, Brazil, Canada, Hong Kong, Hungary, Mexico, the People's Republic of China, Poland, the Republic of Korea, Spain, Taiwan, Turkey and Yugoslavia (Preliminary), Inv. Nos. 701-TA-307, 731-TA-498-511 ("1991 Determination"), USITC Pub. 2374 at 20 (April 1991)); (2) the Commission's interchangeability finding essentially ignores the interchangeability prong, NTN's Mot. at 82; and (3) "evidence on the record, which is not contested by any party, indicates that ADP bearings are not even interchangeable between different positions in the same model of aerospace engines[,]" Id. at 83 (citing NTN's App. 11 (confidential version)); see also NTN's Apps. 13 and 14 (confidential versions).

Third, regarding channels of distribution, NTN contends that contrary to the Commission's finding, "the channel of distribution for ADP ball bearings is not OEM, but rather, very limited and industry-specific OEM." NTN's Mot. at 84 (citing NTN's App. 11 (confidential version)). Specifically, NTN alleges "there is not so much a 'channel of distribution' to aerospace OEMs, but rather, a channel of production contracting by aerospace OEMs." NTN's Mot.

at 84.

Fourth, with respect to the production facilities and personnel factor, NTN argues that this Court "should remand [the Commission's determination] to the ITC to obtain further information in order to determine the extent to which ADP ball bearings and ball bearings are actually produced (rather than merely tested) at single facilities." Id. at 85.

Fifth, regarding the customer and producer perceptions, NTN contends that the Commission's finding that "'[c]ustomer perception is of limited use in distinguishing ADP bearings as a separate product category . . .'" is illogical because "the record gives every indication that ADP ball bearing purchasers have very strong, well-documented perceptions regarding ADP versus non-ADP ball bearings." NTN's Mot. at 86-87 (quoting Final Determination, USITC Pub. 3309, Vol. 1 at 12); see also NTN's Mot. at 87 (citing NTN's App. 13 at 14, 16 (confidential version)). Additionally, NTN argues that "manufacturers of ADP ball bearings also have insightful perceptions concerning ADP ball bearings versus non-ADP ball bearings" but the Commission's "determination did not address the perceptions of the manufacturers at all." NTN's Mot. at 88.

Finally, with respect to the price factor, NTN asserts that "[w]hile there are undoubtedly specific bearing models that sell

for prices as high or higher than ADP ball bearings, the [Commission] has misinterpreted the record evidence in using these specific bearing models as a comparison against ADP ball bearings in general." Id. at 89. In particular, "ADP ball bearings are all at the upper end of the price range for bearings, while specific non-ADP models may also be in this price range." Id.

### C. Commission's Contentions

The Commission responds that "the Commission's determination that ADP ball bearings did not constitute a separate domestic like product was supported by substantial evidence and in accordance with law." Def.'s Mem. at 14; see also id. at 14-36.

First, with respect to the physical characteristics and end uses factor, the Commission maintains that "[n]o party disputed that ADP bearings are physically similar to non-ADP bearings, with both including races, cages, and ball rollers." Id. at 18 (citing Def.'s Mem., App. Vol. 1, Doc. No. 167 at BB-I-29 (confidential version); Def.'s Mem., App. Vol. 1, Doc. No. 710 at 139). The Commission further maintains that the parties in support of a separate like product treatment for ADP bearings do not argue that ADP ball bearings and other ball bearings perform different functions. See Def.'s Mem. at 18. The Commission then responds to the parties' contentions and argues that: (1) although NTN "may or

may not be correct in its contention that there are no other 'general groupings' that all require a specific type of specialty steel[,]" the Commission does not need to find a general grouping that uses the same materials and "[t]he record supported the Commission's conclusion that the use of specialty steels was not unique to the production of ADP bearings[,]" Def.'s Mem. at 19-20; (2) NSK's arguments regarding the testimony of Ms. Demerling, statements made by Mr. Gridley and statements supplied in a post-hearing submission are without merit because "[t]he Commission, as trier of fact, is the proper party to determine the credibility of witnesses and to interpret reasonably the evidence collected in the course of its investigations."[11]    Id. at 21 (citing Negev Phosphates, Ltd. v. U.S. Dep't of Commerce, 12 CIT 1074, 1091-92, 699 F. Supp. 938, 953 (1988).  Additionally, the Commission cites to Kern-Liebers USA, Inc. v. United States, 19 CIT 87, 91-92 (1995), and points out that the Court has sustained "a Commission finding that a type of cold-rolled steel which required additional special processing, was produced only for one demanding end use, and was produced only to federally-mandated safety specifications, did not constitute a domestic like product separate from other

---

[11]  In its reply brief, NSK-RHP argues that page BB-I-29 of the staff report is not based on record evidence.  See NSK-RHP's Reply at 5.   NSK-RHP maintains that "neither [the Commission] nor [Timken] ha[s] directed the Court to expert witness testimony, questioannaire responses, or other documentary evidence as support for the Staff Report's conclusion."  Id.

types of cold-rolled steel." Def.'s Mem. at 23.

Second, responding to the arguments raised by NTN and NSK-RHP with respect to the interchangeability factor, the Commission maintains that: (1) "[i]nterhchangeability is . . . limited between ADP and non-ADP bearings, as non-ADP bearings are not designed for ADP environments and ADP bearings are not cost-efficient substitutes for non-ADP bearings[,] [b]ut the interchangeability between ADP bearings and non-ADP bearings is no more limited than between other ball bearings within the domestic like product that are designed for different uses[,]" id. at 25 (citing Def.'s Mem., App. Vol. 1, Doc. No. 167 at BB-I-33 (confidential version); (2) "[t]he record . . . indicated that interchangeability among similar bearings was high, but interchangeability between ball bearings manufactured for specific purposes or to specific tolerances was limited[,]" Def.'s Mem. at 26; and (3) "[t]he record . . . indicated that a similarly limited degree of interchangeability existed both between and within ADP and non-ADP ball bearing categories." Id. at 26-27.

Third, responding to the arguments raised by NTN and NSK-RHP with respect to the channels of distribution factor, the Commission argues that: (1) "[t]he record . . . reveals evidence that increased customization is the norm for all ball bearing production . . . [and] OEM purchasers from every industry are involved in

design and manufacture[,]" id. at 28 (citing Def.'s Mem., App. Vol. 1, Doc. No. 140 (Timken's Post-Hearing Br. Resp. Commissioner Hillman) at 16 (confidential version); and (2) "[p]urchasers themselves believe that they are receiving customized products responsive to their specific end uses." Def.'s Mem. at 28-29 (citing Def.'s Mem., App. Vol. 1, Doc. No. 167 at BB-I-33 (confidential version).

Fourth, responding to the arguments raised by NTN and NSK-RHP with respect to the production facilities and personnel factor, the Commission contends that: (1) "[e]vidence on the record indicated that [a certain number of] domestic producers produced non-ADP bearings on the same equipment as ADP bearings[,]" Def.'s Mem. at 29 (citing Def.'s Mem., App. Vol. 1, Doc. No. 140 at 17 (confidential version); (2) both NSK-RHP and NTN admit that the record contains evidence that a certain number of domestic producers manufactured both ADP and non-ADP bearings at the same location,[12] see Def.'s Mem. at 29-30; (3) NSK-RHP and NTN "misstate the nature of their expert's testimony and interpret this portion of the like product test too narrowly[,]" id. at 30; and (4) "[t]here is no evidence in the record that non-ADP bearings cannot

---

[12]  NSK-RHP argues that the Commission mischaracterizes NSK-RHP's argument because "the record contains no evidence that [a certain company] manufactures non-ADP bearings on ADP equipment and two sentences of testimony that MPB [another company] does." NSK-RHP's Reply at 9.

be produced on ADP equipment, and there is evidence, some of it
from plaintiff's own expert, that such production actually occurs."
Id. (citation omitted).

Fifth, responding to the arguments raised by NTN and NSK-RHP
with respect to the customer and producer perceptions, the
Commission maintains that: (1) contrary to NTN's assertion that the
ADP purchasers' lack of knowledge regarding other bearings
indicates that the ADP market is a separate market from the non-ADP
market, "[i]f the relative isolation of purchasers extended only to
ADP buyers, plaintiff's argument might be valid. But most non-ADP
ball bearing producers and purchasers showed little interest . . .
with products and markets outside their own niche[,]" Def.'s Mem.
at 31; (2) contrary to NSK-RHP's argument, there were two domestic
producers of ADP bearings who "opposed a separate like product
definition for ADP bearings[,]"[13] id. at 32; (3) contrary to NSK-
RHP's argument that the Commission's view regarding customer
perception is not in accord with Torrington Co., 14 CIT at 654-55,
747 F. Supp. at 751, "in its evaluation of the evidence regarding
customer perceptions, in these instant reviews, the Commission
recognized that purchasers did have detailed perceptions regarding
the bearings that suited their particular purposes . . . [but were

---

[13] NSK-RHP argues that "the Commission below voiced no opinion
about producers' perception, so any argument made by the
[Commission] on this point constitutes unacceptable post-hoc
rationalization by counsel." NSK-RHP's Reply at 15.

rarely] knowledgeable about other sections of the market[,]" id. at 33 (citations omitted); and (4) contrary to plaintiffs' argument that the Commission did not adequately weigh customer and producer perceptions, "[t]he Commission reasonably determined that the evidence regarding product perception was limited because of the breadth of the product and buyers' limited knowledge, and weighed the evidence accordingly." Def.'s Mem. at 34.

Finally, responding to NSK-RHP's and NTN's arguments regarding the price factor, the Commission asserts:

> The data . . . indicates that overall ADP bearing prices are somewhat higher than prices for non-ADP bearings. But the data on the record for both ADP and non-ADP bearings shows tremendous variation in price, depending in part on the size, order volume, and material used in fabricating the bearing. The Commission thus reasonably determined that this evidence of variation in price, across both ADP and non-ADP bearings, did not warrant treating ADP bearings as a separate like product.

Id. at 36. Moreover, the Commission maintains:

> The domestic like product of ball bearings covered a wide variety of products. In reaching its determination regarding like product, the Commission considered its original like product determination and its practice in other cases involving similar 'continuum' products. While acknowledging record evidence favoring a separate like product for ADP bearings, the Commission weighed all of the available like product evidence and concluded that a bright diving line did not exist.

Id.

### D.    Timken's Contentions

Timken generally agrees with the Commission and maintains that the Commission's determination that ADP bearings did not constitute a separate like product is supported by substantial evidence. See Timken's Resp. at 74-95. Timken additionally argues inter alia that: (1) "NSK-RHP's attacks on witness credibility and citations used in [Timken's] post-hearing brief to the Commission are inappropriate[,]" id. at 80, see also id. at 80-85; (2) "contrary to NTN's assertion, the Commission reasonably determined there was no clear dividing line between ADP and non-ADP bearings[,]" id. at 85; see also id. at 85-87; and (3) contrary to NTN's argument that the Commission departed from a previous ball bearing investigation when addressing the interchangeability factor, the Commission in the 1991 Determination, USITC Pub. 2374, "as in the present sunset determination . . . found that the interchangeability prong of its like product test unhelpful in making its like product determination."[14] Id. at 90.

---

[14]  Timken argues that in the 1991 Determination, USITC Pub. 2374 at 6-14, the Commission did not mention the interchangeability factor in its like product determination. See Timken's Resp. at 90. The Court, after consulting the 1991 Determination, finds that the Commission in that determination did not explicitly discuss the interchangeability factor in its like product determination and, therefore, the Court finds that contrary to NTN's argument, the Commission in the case at bar did not depart from its previous determination in the 1991 Determination.

### 4.    Analysis: ADP Bearings

As a preliminary matter, the Court finds that NSK-RHP's arguments regarding the testimony of a witness, statements made by a witness and statements supplied in a post-hearing submission are without merit.  See Floral Trade Council v. United States, 20 CIT 595, 600 (1996) (quoting Negev Phosphates, 12 CIT at 1092, 699 F. Supp. at 953 ("'assessments of the credibility of witnesses are within the province of the trier of fact.  This Court lacks authority to interfere with the Commission's discretion as trier of fact to interpret reasonably evidence collected in the investigation'").

Next, the Court finds that the Commission's determination that ADP bearings do not constitute a separate like product is supported by substantial evidence and is in accordance with law.  The Commission's like product determination is a factual determination that is conducted on a case-by-case basis.  See Chefline Corp., 25 CIT at ___, 170 F. Supp. 2d at 1327 (citing Torrington Co., 14 CIT at 652 n.3, 747 F. Supp. at 749 n.3).  As stated above, the Commission considers the following six factors in defining the like product:  (1) physical characteristics and uses;  (2) interchangeability of the products; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) the use of common manufacturing facilities and personnel; and (6) price.

See Timken, 20 CIT at 80, 913 F. Supp. at 584 (citation omitted).

The Court "review[s] the Commission's determination for substantial

evidence, bearing in mind that 'it is not the province of the

courts to change the priority of the relevant like product factors

or to reweigh or judge the credibility of conflicting evidence.'"

Chefline Corp., 25 CIT at ___, 170 F. Supp. 2d at 1327-28 (quoting

Chung Ling Co. v. United States, 16 CIT 636, 648, 805 F. Supp. 45,

55 (1992)). Additionally, "'minor differences' . . . do not merit

a separate like product determination." Kern-Liebers, 19 CIT at 92

(citing Cambridge Lee Indus., Inc. v. United States, 13 CIT 1052,

1055, 728 F. Supp. 748, 750-51 (1989) (quoting in turn S. Rep. No.

249, 96th Cong., 1st Sess. 90-91 (1979), reprinted in 1979

U.S.C.C.A.N. 381, 476-77 (the like product determination "should

not be narrowly interpreted 'as to permit minor differences in

physical characteristics or uses to lead to the conclusion that the

[domestic] product and [the imported] article are not 'like' each

other'")).

> In the case at bar, the Commission determined that:

> ADP bearings [do not] comprise a separate domestic like
> product. While the record indicates some differences in
> physical characteristics, end uses, interchangeability,
> price, and facilities between ADP bearings and other
> [ball bearings] . . ., [the Commission] find[s] that the
> similarities outweigh these differences. The record
> shows that the special materials and special machinery
> and facilities used to produce ADP bearings are also used
> in the production of other highly specialized bearings
> and that other types of precision and non-precision
> bearings may command prices as high as those for ADP

bearings.    With respect to interchangeability, all
bearings, and not ADP bearings in particular, are only
interchangeable with other bearings on a parts number
basis.  Customer perception is of limited use in
distinguishing ADP bearings as a separate product
category, given that purchasers typically buy all types
of bearings by part number and are familiar only with the
specifications of the particular products they purchase.
In addition, while ADP bearings are sold only to OEMs, so
is the majority of [United States] producers' sales of
non-ADP ball . . . bearings, with [United States]
producers shipping 79.1 percent of their [United States]
[ball bearing] shipments . . . to OEMs.  In cases such as
the present one, where the domestically manufactured
merchandise is made up of a continuum of similar
products, [the Commission] normally do[es] not consider
each item of merchandise to be a separate domestic like
product that is only "like" its counterpart in the scope,
but consider[s] the continuum itself to constitute the
domestic like product.  Given the "continuum" nature of
bearings, then, [the Commission] conclude[s] that there
is no clear dividing line between ADP bearings and all
other types of bearings.

Final Determination, USITC Pub. 3309, Vol. 1 at 12-13 (citations

omitted).  In turn, the evidence presented by NSK-RHP and NTN does

not prove that the Commission's finding is not supported by

substantial evidence, but rather, calls for the Court to reach a

different conclusion.  This, the Court is not willing to do.  See

Consolo, 383 U.S. at 620 ("the possibility of drawing two

inconsistent conclusions from the [same] evidence does not"

preclude the Court from holding that the agency finding is

supported by substantial evidence); Acciai Speciali Terni, 24 CIT

at 1081 n.21, 118 F. Supp. 2d at 1313 n.21 (quoting Goss Graphics

Sys., Inc. v. United States, 33 F. Supp. 2d 1082, 1099 (1998),

aff'd, 216 F.3d 1357 (Fed. Cir. 2000) ("'[t]he Commission has

discretion to assess the probative nature of the evidence obtained in its investigation and to determine whether to discount the evidence or rely on it'"); Maine Potato Council v. United States, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985) ("[i]t is within the [ITC's] discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence"); see also American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 ("[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo'") (quoting Penntech Papers Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983), cert. denied, 464 U.S. 892 (1983) (quoting, in turn, Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

Based on the foregoing, the Court sustains the Commission's determination that ADP bearings do not constitute a separate like product from ball bearings.

## II. Conditions of Competition in the Domestic Ball Bearing Industry

### A. Background

In the Final Determination, USITC Pub. 3309, Vol. 1 at 36-38, the Commission: (1) "recognized the increase in both demand and

domestic production but noted that consumption had been flat or declining in the most recent periods[,]" Def.'s Mem. at 76 (citation omitted); (2) "noted the importance of the OEM sector, given the large production volumes associated with OEM sales, and the use of certification processes by most OEMs[,]" id.; (3) "found that ball bearings were 'more like a commodity product' than other antifriction bearings[,]" id.; (4) "recognized that most purchasers look for quality and dependability as well as price in their ball bearing purchases[,]" id.; (5) "found a fair degree of substitutability that, combined with the commodity-like nature of the product, made ball bearings a more price-competitive product than other antifriction bearings[,]" id.; (6) "noted the differing dynamics of the ball bearing industry as compared to other antifriction bearing industries[,]" id.; (7) "noted that there were at least 35 domestic producers, with no single dominant producer[,]" id.; (8) "described the domestic industry as fragmented[,]" id.; and (9) "found that the domestic industry included production facilities owned by large multinational producers . . . that . . . typically produced for the local market in their domestic facilities but did engage in a degree of global rationalization among production sources." Id. at 76-77; see also Final Determination, USITC Pub. 3309, Vol. 1 at 36-38.

B.    Contentions of the Parties

NTN contends that the Commission's findings that: (1) ball bearings are more commodity-like, have a high degree of substitutability and are more price-competitive than other antifriction bearings; (2) the ball bearings industry is fragmented; and (3) demand for ball bearings is weak are unsupported by substantial evidence.  See NTN's Mot. at 22-31, 37-49; see also NTN's Reply at 6-14.

With regard to the Commission's finding that ball bearings are more commodity-like than other antifriction bearings, NTN argues that: (1) the Commission did not define what it meant by a commodity, see NTN's Mot. at 23; (2) although the Commission refers to ball bearings as commodity-like and not as a commodity, "[i]t is clear that the ITC's determination must have been based on an assumption that ball bearings were, in fact, commodities[,]"[15] id.; (3) "[t]he statement that any particular bearing type is the 'most' commodity-like has very little meaning without also addressing the

_____

[15] NTN maintains that since the Commission's determination was based on the assumption that ball bearings were commodities and the record does not support such a finding, "the decisions based on this faulty assumption do not satisfy the requirement that there be a rational connection between the facts found and the final determination made."  NTN's Mot. at 23-24 (citing Burlington Truck, 371 U.S. at 168).

context in which the statement is made[,]"[16] id. at 24; (4) Timken's pre-hearing brief cited by the Commission in the Final Determination, USITC Pub. 3309, Vol. 1 at 37 n.271, constitutes insufficient record evidence because the statement in Timken's pre-hearing brief that "'bearings of all types and configurations are considered commodity products that compete largely on the basis of price[,]'" NTN's Mot. at 24 (quoting NTN's App. 2) is a "statement [that] has no record support other than the ITC Prehearing Staff Report's having stated it[,]" NTN's Mot. at 24; (5) Timken's pre-hearing brief discusses all bearings together rather than discussing ball bearings separately and, therefore, the Court should disregard the Commission's citations to Timken's pre-hearing brief for the premise that ball bearings are more commodity-like than antifriction bearings, see id. at 25; (6) "[r]egarding the statement by the president of SKF USA, Stan Malmstrom, it is important to note that neither Mr. Malmstrom, nor any other witness indicated that ball bearings were, in fact, commodity-like[,]" and the Commission should have not given the weight that it did to this statement, id.; and (7) unlike "commodities [which] are completely interchangeable and purchase decisions are based strictly on price[,]" "ball bearings are . . . not commodities [because]

---

[16]    NTN points out that "since ITC never discloses how 'commodity-like' it deems other antifriction bearings, the comparative description of ball bearings as 'more commodity-like' is meaningless." NTN's Mot. at 30-31.

[q]uality, production technology, design, applications, availability, service, delivery, lead time, availability of a NAFTA certification, and other factors all differ considerably among ball bearings." Id. at 26; see also NTN's Mot. at 26-30 and NTN's Apps. 5, 6.

Next, with respect to the Commission's finding that the ball bearings industry is fragmented, NTN contends that "the statement the ITC cited to in order to support the statement that, 'there are many suppliers able to meet purchasers' non-price concerns . . . leaving price as the primary remaining area of competition' is a discussion about TRBs, not ball bearings." NTN's Mot. at 39-40 (quoting Final Determination, USITC Pub. 3309, Vol. 1 at 40 (citation omitted)). NTN further contends that the Commission "ignores past agency practice and appears to assert that fragmentation can be determined by comparison alone." NTN's Reply at 8; see also NTN's Mot. at 40-46.[17]

---

[17]    NTN asserts that the Commission has considered the following factors when determining whether a particular industry is fragmented:

    1) A large number of competitors in the industry;
    2) Varying size of competitors in the industry;
    3) Minimal barriers to entry in the industry; and
    4) No competitor or competitors dominate the market.

NTN's Mot. at 40 (citing Frozen Concentrated Orange Juice From Brazil, Inv. No. 731-TA-326 (Review), USITC Pub. No. 3195 at 3 and Appendix B (May 1999); Industry & Trade Summary: Apparel, USITC Pub. 3169 at 3-4 (March 1999); Industry & Trade Summary: Adhesives,
(continued...)

Finally, NTN asserts that the Commission's determination that the demand for ball bearings was weak in the United States was not supported by substantial evidence on the record and is otherwise not in accordance with law. See id. at 46. In particular, NTN argues that the Commission erroneously analyzed the demand data because "[t]hroughout its determination, the ITC seems to neglect the tremendous growth in [United States] consumption between 1987 and 1998, while focusing in on the recent interim data which showed a slight decline." Id. at 47. NTN maintains that "[b]y doing so, [the Commission] created a highly distorted and negative picture of [United States] ball bearing demand which is not in accord with the record evidence, taken as a whole, in this case." Id. NTN further maintains that "[d]uring what the ITC characterizes as a period of 'weak demand,' the market share of domestic shipments actually increased . . . [while] the market share of subject imports decreased indicating that the subject imports have no effect on domestic production regardless of the state of [United States] demand." Id. at 48 (citing Final Determination, USITC Pub. 3309,

---

[17](...continued)
Glues, and Gelatin, USITC Pub. 3093 at 6 (March 1998); Industry Report: Hose, Belting, and Plastic Pipe, USITC Pub. No. 2866 (March 1995); Industry Report: Leasing Services, USITC Pub. No. 2864 (March 1995); and Certain Red Raspberries From Canada, USITC Inv. No. 731-TA-196 (Preliminary), Pub. No. 1565 (August 1984). NTN further points out that "[t]he four criteria listed above have been discussed by the ITC when determining that an industry is fragmented . . . [but] [n]ot all four criteria are discussed in each case[.]" NTN's Mot. at 42.

Vol. 2 at BB-I-2).  Moreover, NTN argues that "record evidence indicates that demand is expected to remain high." NTN's Mot. at 48 (citing NTN's Mot. App. 7 at I-25 (confidential version)).

The Commission responds that its findings regarding the conditions of competition in the domestic ball bearing industry are supported by substantial evidence and are in accordance with law. See Def.'s Mem. at 76-81.  First, the Commission argues that its determination that ball bearings are more commodity-like than other antifriction bearings was supported by substantial evidence. See id. at 77-78.  In particular, the Commission maintains that: (1) the Commission did not find that ball bearings were commodities, but rather that they "were closer to being commodities than were other antifriction bearings[,]" id. at 77; (2) "[o]f the 122 total responses regarding interchangeability, 113 reported interchangeability and only nine observed that subject imports were not interchangeable with the domestic like product[,]" id. at 78 (citing Final Determination, USITC Pub. 3309, Vol. 2 at Tbl. BB-II-3); (3) "[t]here was evidence on the record that ball bearings that a customer might believe to be customized were in fact commodity-like items with slight modifications[,]" Def.'s Mem. at 78 (citing Def.'s Mem., App. Vol. 1, Doc. No. 167 at BB-I-32 (confidential version)); (4) "parties favoring continuation [of the ball bearing antidumping duty orders] pointed to evidence that purchasers are unwilling to pay higher prices for bearings that could be deemed

customized[,]" Def.'s Mem. at 78 (citing Def.'s Mem. App. Vol. 1, Doc. No. 167 at BB-I-34 (confidential version)); and (5) "[t]he record indicated that multiple sourcing was common, and that many purchasers typically dealt with more than one supplier." Def.'s Mem. at 78 (citation omitted).[18]

Second, the Commission asserts that its finding that the domestic ball bearings industry is fragmented was supported by substantial evidence. See Def.'s Mem. at 79-80. The Commission points out that: (1) SKF agrees with the Commission that the ball bearing industry is fragmented, see id. at 79 (citing Br. Supp. SKF's Rule 56.2 Mot. J. Agency R. ("SKF's Mot.") at 2); (2) "the ball bearing industry consisted of at least 35 producers, with no single dominant producer[,]" Def.'s Mem. at 79 (citation omitted); and (3) "[g]iven that the industry has high capital requirements and requires high capacity utilization rates to be profitable, . . . differences in the number and size of producers are significant."[19] Def.'s Mem. at 80.

---

[18] The Commission responds to NTN's argument that Mr. Dykstra (a witness that the Commission cited to in the Final Determination, USITC Pub. 3309, Vol. 1 at 40 n.297, for the proposition that multiple sourcing was common) was only discussing the tapered roller bearing market during the hearing by asserting that "Mr. Dykstra specifically stated that the conditions he discussed as applying to the tapered roller bearing market also applied to the ball bearing market." Def.'s Mem. at 78 n.273 (citing Def.'s Mem. App. Vol. 1, Doc. No. 710 at 314).

[19] The Commission states:

(continued...)

Finally, the Commission contends that its determination that

United States demand for ball bearings was weak was supported by

substantial evidence.   See id. at 80-81.   Specifically, the

Commission maintains that: (1) "[t]he Commission noted the increase

in demand over the years since the orders were imposed . . . [b]ut

the Commission found demand by value to have increased only 1.4

percent between 1997 and 1998[,]" id. at 80; (2) "[t]otal domestic

demand as measured by value declined 3.2 percent between the

interim periods of January-September 1998 and January-September

1999[,]"[20] id. (citing Final Determination, USITC Pub. 3309, Vol.

_____

[19](...continued)
The single largest producer [of ball bearings] accounted
for [a certain] percent of [United States] shipments by
value in 1998.  In comparison, the tapered roller bearing
domestic industry had 12 firms, with the largest
accounting for [a certain percent that was much higher
than the percent for ball bearings] of domestic shipments
by value; the cylindrical roller bearing industry had 15
firms, with the largest accounting for [a certain percent
that was higher than the ball bearing percent and lower
than the tapered roller bearing percent] of domestic
shipments by value in 1998; and the spherical plain
bearing industry had 9 producers, with the largest
accounting for [a certain percent that was higher than
the ball bearing percent but lower than the tapered
roller bearing and cylindrical roller bearing percent] of
domestic shipments by value in 1998.

Def.'s Mem. at 79-80 (citations omitted).

[20]   The Commission points out:

In comparison, demand for tapered roller bearings as
measured by value [during certain periods increased by
certain percentages].  Demand for cylindrical roller
bearings as measured by value increased 9.4 percent

(continued...)

2 at Tbl. C-2); (3) contrary to NTN's argument that the Commission should have given greater weight to forecasts indicating increased demand, NTN "does not establish why the Commission ought to have given greater weight to such forecasts when they failed to even anticipate the downturn shown in the Commission's data for the interim period[,]" Def.'s Mem. at 81; and (4) "[t]here was no reason to believe that forecasts that proved inadequate in projecting near-term demand would be any more accurate in projecting long-term demand." Id.

Timken generally agrees with the Commission and maintains that "NTN's arguments regarding the Commission's observations that the industry is fragmented and ball bearings are commodity-like are without any merit[,]" Timken's Resp. at 46, and "the Commission's conclusion that demand for ball bearings was weak was supported by substantial evidence." Id. at 59. First, with respect to the Commission's finding that ball bearings are more commodity-like

---

[20](...continued)
between 1997 and 1998 and by 2.9 percent in the interim comparisons.

Def.'s Mem. at 80 n.281 (citing Final Determination, USITC Pub. 3309, Vol. 2 at Tbls. C-1 and C-3). NTN replies that "[w]hen compared, [ball bearing] demand by value declined less than both [tapered roller bearing] and [cylindrical roller bearing] demand by value over the same period of time" that is, interim 1999. NTN's Reply at 13. Moreover, NTN argues that "[a] sunset review is prospective in nature . . . [and] [t]he Commission focused on the most recent past data in its analysis rather than focusing on the significant evidence regarding future demand." Id. at 14 (citation omitted).

than other antifriction bearings, Timken maintains that: (1) Mr. Malmstrom's testimony "clearly expressed Mr. Malmstrom's opinion . . . that ball bearings were the most commodity-like of the antifriction bearings[,] id. at 50; (2) although Timken's pre-hearing brief "does not expressly provide that ball bearings are more commodity-like than other antifriction bearings, it nevertheless lends support to the Commission's conclusion that ball bearing[s] are commodity like products[,]" id. at n.18; (3) "substantial record evidence . . . supported the Commission's related observations that bearings of all types, including ball bearings, compete on price and were highly interchangeable or substitutable regardless of origin[,]" id. at 51, see also id. at 51-55; (4) "the Commission's choice of the term 'commodity-like' instead of 'commodity' demonstrates that it took into account [NTN's] contention that bearings were not commodities in the traditional sense[,]" id. at 56; and (5) various arguments raised by NTN are merely NTN's interpretation of the evidence. See Timken's Resp. at 57-58.

Second, with respect to the Commission's determination that the domestic ball bearings industry is fragmented, Timken argues that contrary to NTN's assertion that the Commission ignored past agency practice when the Commission failed to consider various factors in determining whether the domestic industry was fragmented, "as NTN admits, the Commission has not established a

rigid test for determining when, or whether, it may characterize an industry as fragmented or not[,] . . . [i]nstead, the Commission looks to a variety of factors relevant to the particular industry being examined." Timken's Resp. at 48 (citing Ranchers-Cattlemen Action Legal Foundation v. United States, 23 CIT 861, 884-85, 74 F. Supp. 2d 1353, 1374 (1999)).[21]

Finally, with respect to the Commission's finding that demand in the domestic ball bearing industry is weak, Timken contends that: (1) "[a]s stated numerous times in party submissions and testimony before the Commission bearing demand had peaked and begun

---

[21] Timken also argues that the various Industry and Trade reports cited by NTN are not cases that establish agency practice but rather are published for informational purposes only. See Timken's Resp. at 48 (citing Industry & Trade Summary: Apparel, USITC Pub. No. 3169 at iii n.1). Additionally, Timken maintains that "[t]he reference in Orange Juice, [USITC Pub. 3195] to the fragmented nature of the industry is not even contained in the Commission's determination on whether to revoke or retain the order, but rather only in appendix B, the Commission's decision as to the adequacy of the domestic industry's response." Timken's Resp. at 49 n.16.

NTN responds that "[i]t is true that the Commission has not published a statement akin to 'this is the test for determining whether an industry is fragmented.' However, the Commission's actions have arguably created a 'de facto' established and uniform practice." NTN's Reply at 10 (citing inter alia, International Light Metals v. United States, 194 F.3d 1355, 1361 (Fed. Cir. 1999), and Heraeus-Amersil, Inc. v. United States, 9 CIT 412, 416, 617 F. Supp. 89, 94 (1985)).

The Court agrees with Timken that the Industry and Trade reports cited by NTN are for information purposes only and do not establish Commission practice.

to flatten out and decline by the end of the review period[,]"[22] Timken's Resp. at 59 (citing inter alia App. Timken's Br. Resp. Pls.' Rule 56.2 Mot. J. Agency R. ("Timken's Resp. App.") 7 at 212-13); (2) "demand for bearings was dependent on demand for bearing consuming industries such as automotive, aerospace and agricultural equipment . . . [and] [p]roduction in these industries had either already declined or was projected to decline in the near future[,]" Timken's Resp. at 59 (citations omitted); (3) "[a]ssertions that past increases in demand undermine the Commission's characterization of current demand are misplaced . . . [because] the overall growth of domestic ball bearing demand does not render the industry immune from the present or future consequences of declines in demand[,]" Timken's Resp. at 60; and (4) contrary to NTN's argument, the Commission did consider evidence that suggested an increase in demand. See id.

### C. Analysis

As a preliminary matter, the Court finds that the Commission does not have an established practice of determining whether the domestic industry is fragmented. See Ranchers-Cattlemen, 23 CIT at 884-85, 74 F. Supp. 2d at 1374 ("[a]n action by the ITC becomes an 'agency practice' when a uniform and established procedure exists

---

[22]    NTN replies that "[t]he Commission ignored significant evidence that showed that [the United States ball bearing] demand was not weak."  NTN's Reply at 14.

that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure"); see generally Ugine-Savoie Imphy v. United States, 26 CIT ___, ___, 248 F. Supp. 2d 1208, 1220 (2002) ("There is limited precedential value in sunset reviews since each case presents unique interactions of the economic variables the Commission considers" (citation omitted)).  The Court has examined Frozen Concentrated Orange Juice From Brazil, USITC Pub. No. 3195 at 3 and App. B, and Certain Red Raspberries From Canada, USITC Pub. No. 1565, cited by NTN and agrees with Timken that the Commission does not have an established practice of determining whether the domestic industry is fragmented.  Furthermore, the Court is not persuaded by NTN's argument that the Commission created a "de facto" established practice of determining whether a domestic industry is fragmented.  In particular, unlike the case cited by NTN, Heraeus-Amersil, 9 CIT at 416, 617 F. Supp. at 94, where the Court found that classification of a certain merchandise under two item numbers of the TSUS of over 300 liquidations at two ports over a ten-year period qualified as a uniform and established practice upon which the plaintiff could rely absent a published notice of a contemplated change in classification practice, in this case, the Commission's decisions in Frozen Concentrated Orange Juice From Brazil, USITC Pub. No. 3195 at 3 and App. B, and Certain Red Raspberries From Canada, USITC Pub. No. 1565, do not amount to the

creation of a "de facto" established practice for determining whether an industry is fragmented.[23]

Next, the Court turns to the issue of whether the Commission's determination regarding conditions of competition in the domestic ball bearing industry was supported by substantial evidence and was in accordance with law. In the Final Determination, the Commission determined:

> Measured by value, demand for [ball bearings] approximately doubled between 1987 and 1998. In the more recent time period, consumption has been relatively flat, increasing by only 1.4 percent between 1997 and 1998. Consumption of [ball bearings] declined between interim 1998 and interim 1999.

> . . . .

> [Ball bearings] are more like a commodity product than are other antifriction bearings. There is a significant degree of perceived substitutability between domestically produced [ball bearings] and subject imports. Purchasers cite price as an important factor in making purchasing decisions, although they also look for quality and delivery dependability. Given a fair degree of substitutability and the commodity-like nature of the product, [ball bearings] are more price-competitive than other antifriction bearings.

> Unlike the other antifriction bearing industries,

---

[23] NTN also cites to International Light Metals, 194 F.3d at 1361, to support its argument of a "de facto" established practice for determining whether an industry is fragmented. The Court notes that the Court of Appeals for the Federal Circuit ("CAFC") in International Light Metals did not reach International Light Metals' arguments regarding Customs' deviation from a long-standing administrative practice because the CAFC "concluded that summary judgment was improperly granted in favor of the government based upon an erroneous view of the requirements of the statute." International Light Metals, 194 F.3d at 1367 n.15.

there are many small producers in the [ball bearing] industry, and there is no single dominant producer. There are at least 35 domestic [ball bearings] producers. . . .

The industry includes production facilities owned by large multinational producers that have facilities in several nations. These large producers typically produce for the local market, but also engage in some degree of global rationalization. Japanese-owned firms in particular have increased in [United States] production capacity. By 1998, nearly half of all [United States]- produced [ball bearings] were produced by foreign-owned firms. Domestically owned producers such as [Timken] also own or are affiliated with producers in other markets.

The years 1985-1987 were marked by a noticeable decline in domestic [ball bearing] production capacity, which fell from 295.6 million units in 1985 to 258.9 million by 1987. However, by 1997 capacity was approximately doubled what it had been in 1987. Capacity rose again in 1998 but declined in interim 1999 compared to interim 1998. In quantity terms, domestic production declined from 1997 to 1998 and showed a decline in interim 1999 compared to the same time period in 1998. The [ball bearing] industry is mature and capital-intensive and must operate at high capacity utilization rates to be profitable. [Ball bearings] are typically produced on dedicated machinery, and firms cannot easily switch production from one type of bearing to another. Likewise, it is difficult for domestic producers to shift sales of [ball bearings] from domestic purchasers to overseas purchasers.

Final Determination, USITC Pub. 3309, Vol. 1 at 36-38 (citations omitted).

The Court finds the Commission's determinations that the ball bearings industry is fragmented and demand for ball bearings is weak are supported by substantial evidence and are in accordance with law. First, with respect to the Commission's determination

that the ball bearing industry is fragmented, the arguments raised by NTN do not prove that the Commission's finding is not supported by substantial evidence, but rather, call for the Court to reach a different conclusion.    See Consolo, 383 U.S. at 620 ("the possibility of drawing two inconsistent conclusions from the [same] evidence does not" preclude the Court from holding that the agency finding is supported by substantial evidence).    Second, with respect to the Commission's determination that demand for ball bearings is weak, NTN's arguments that the Commission focused on the recent interim data which showed a decline rather than focusing on the growth in United States consumption between 1987 and 1998 data and that the Commission should have given greater weight to forecasts indicating increased demand are without merit because NTN may not usurp the Commission's role as fact-finder and substitute their analysis for the result reached by the Commission.  See Maine Potato Council, 9 CIT at 300, 613 F. Supp. at 1244 ("[i]t is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence").

However, the Commission's failure to discuss how commodity-like it deems the other antifriction bearings prevents the Court from reviewing the Commission's determination that ball bearings are 'more commodity-like' than other antifriction bearings intelligibly.  Accordingly, the Court remands this issue to the

Commission to explain how commodity-like it deems the other antifriction bearings.

## III. The Commission's Cumulation of Subject Imports of Ball Bearings from France, Germany, Italy, Japan, Singapore and the United Kingdom

### A. Background

#### 1. Statutory Background

In its 19 U.S.C. § 1675a(a)(1) determination, the Commission considers "the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked . . . ." Title 19 of the United States Code also states that the Commission shall consider:

> (A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued . . . ,
>
> (B) whether any improvement in the state of the industry is related to the order . . . ,
>
> (C) whether the industry is vulnerable to material injury if the order is revoked . . . , and
>
> (D) in an antidumping proceeding under [19 U.S.C. § 1675(c)] . . . , the findings of the administering authority regarding duty absorption under [19 U.S.C. § 1675(a)(4)] . . . .

19 U.S.C. § 1675a(a)(1)(A)-(D) (1994).

However, before the Commission conducts its likelihood of material injury upon revocation analysis under 19 U.S.C. §

1675a(a)(1), the Commission determines whether to cumulatively

assess the volume and effect of subject imports from all countries

for which sunset reviews were initiated on the same day.  Section

1675a(a)(7) of Title 19 provides that:

> the Commission may cumulatively assess the volume and
> effect of imports of the subject merchandise from all
> countries with respect to which reviews under section
> 1675(b) or (c) of this title were initiated on the same
> day, if such imports would be likely to compete with each
> other and with domestic like products in the United
> States market.

19 U.S.C. § 1675a(a)(7).  Although, the statute prohibits the

Commission from cumulating the subject merchandise if the

Commission "determines that such imports are likely to have no

discernible adverse impact on the domestic industry[,]" id., "in

all other instances cumulation is discretionary, not mandatory."

Ugine-Savoie Imphy, 26 CIT at ___, 248 F. Supp. 2d at 1210; see

also Indorama Chems. (Thailand) Ltd. v. USITC, 2002 Ct. Intl. Trade

LEXIS 155, at *17, Slip Op. 02-155 (Sept. 4, 2002) (citations

omitted), and Statement of Administrative Action ("SAA"), H.R. Doc.

No. 103-316, at 887 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.[24]

---

[24]    The SAA represents "an authoritative expression by the
Administration concerning its views regarding the interpretation
and application of the Uruguay Round agreements."  H.R. Doc. No.
103-316, at 656.  "It is the expectation of the Congress that
future Administrations will observe and apply the interpretations
and commitments set out in this Statement."  Id.; see also 19
U.S.C. § 3512(d) (1994) ("The statement of administrative action
approved by the Congress . . . shall be regarded as an
authoritative expression by the United States concerning the
interpretation and application of the Uruguay Round Agreements and

(continued...)

Thus, the first step in a cumulation discussion is "discernible adverse impact," because the Commission may not cumulatively assess the volume and effect of subject imports if it determines that such imports are "likely to have no discernible adverse impact on the domestic industry." 19 U.S.C. § 1675a(a)(7). In the Final Determination, the Commission notes that since neither the statute nor the SAA provides specific guidance on what factors the Commission is to consider in making its "discernible adverse impact" determination, "the Commission generally considers the likely volume of the subject imports and the likely impact of those imports on the domestic industry within a reasonably foreseeable time if the orders are revoked." Final Determination, USITC Pub. 3309, Vol. 1 at 16-17 (citations omitted). Next, the Commission "must . . . determine that 'a reasonable overlap of competition' exists between imports from different countries" and with the domestic like product. Usinor Industeel, S.A. v. United States, 2002 Ct. Intl. Trade LEXIS 41, at *10-11, Slip Op. 02-39 (April 29, 2002) (quoting Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989)). In order to determine whether a reasonable overlap of competition is likely, the Commission generally considers:

    (1) the degree of fungibility between the imports from

---

(...continued)
this Act in any judicial proceeding in which a question arises concerning such interpretation or application.")

different countries and between imports and the domestic like product, including consideration of specific customer requirements and other quality related questions; (2) the presence of sales or offers to sell in the same geographical markets of imports from different countries and the domestic like product; (3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product; and (4) whether the imports are simultaneously present in the market.

Final Determination, USITC Pub. 3309, Vol. 1 at 17 n.112 (citing Weiland Werke, AG, 13 CIT at 563, 718 F. Supp. at 52). "These factors are not exhaustive, no single factor is determinative, and completely overlapping markets are not required." Corus Staal BV v. USITC, 2003 Ct. Intl. Trade LEXIS 30, at *31, Slip Op. 03-32 (March 21, 2003) (citation omitted). Moreover, since sunset reviews are prospective in nature, in addition to the aforementioned statutory requirements, the Commission considers "other significant conditions of competition that are likely to prevail if the orders under review are revoked." Final Determination, USITC Pub. 3309, Vol. 1 at 17.

### 2.    Factual Background

During this sunset review, the Commission cumulatively assessed the volume and effects of subject imports from France, Germany, Italy, Japan, Singapore and the United Kingdom. See Final Determination, USITC Pub. 3309, Vol. 1 at 33. The Commission's determination to cumulate was based on the Commission's findings

that: (1) "subject imports from all six countries would be likely to have a discernible adverse impact on the domestic industry if the orders were revoked[,]" id.; (2) "a reasonable overlap of competition between the subject imports and the domestic like product [was] likely to exist if the orders were revoked[,]" id.; and (3) there were no "significant differences in the conditions of competition among the subject countries." Id. Additionally, the Commission found that subject imports from Romania and Sweden were not likely to have a discernible adverse impact and, therefore, these countries were not included in the Commission's cumulation. See id.

In the Final Determination, the Commission explained its finding that subject imports from France, Germany, Italy, Japan, Singapore and the United Kingdom would be likely to have a discernible adverse impact on the domestic industry if the orders were revoked by stating:

> Subject imports from France, Germany, Italy, Japan, Singapore, and the United Kingdom have remained in the [United States] market in the years since the orders were imposed. The continuing presence of these subject imports in the domestic market indicates that subject foreign producers continue to have the contacts and channels of distribution necessary to compete in the [United States] market.
>
> The [ball bearing] industry in each of the six countries is export-oriented. In four of the six countries, exports account for [a certain] percent or more of total shipments. While capacity utilization rates in the six countries have generally exceeded [a certain] percent in 1997-1998 and interim 1999, there is

available capacity in each of the six countries. Four of
the six countries are among the top five nations for
total bearing production. [The Commission] therefore
find[s] that there is likelihood of a discernible adverse
impact on the domestic industry if the orders on any of
these six countries were lifted.

Final Determination, USITC Pub. 3309, Vol. 1 at 34-35 (citations

omitted).

The Commission then explained its finding of a reasonable

overlap of competition between the subject imports and the domestic

like product if the orders were revoked by stating:

> In the original determination, the Commission found
> that subject imports from France, Germany, Italy, Japan,
> Singapore, and the United Kingdom competed with each
> other and with the domestic like product and cumulated
> the volume and price effects of those subject imports.
> At that time the Commission noted that competition among
> bearings of different sizes and ratings might be limited,
> but still found that competition existed among all
> imports and the domestic like product for "each type,
> size, and rating." The record in these reviews provides
> no reason to depart from the prior overlap of competition
> findings concerning subject imports of [ball bearings]
> from France, Germany, Italy, Japan, Singapore, and the
> United Kingdom.
>
> Parties in favor of continuation of the order and
> parties favoring revocation agree that [ball bearings]
> are the most commodity-like product of the four products
> in these reviews. Purchasers find domestically produced
> [ball bearings] to be interchangeable with subject
> imports from each of the six countries, despite the
> existence of specialty products and qualification
> requirements. This is true even for subject imports from
> countries such as Singapore and Japan, with parties from
> each raising arguments regarding the lack of domestic
> competition for their subject imports. Purchasers rarely
> make purchasing decisions based on the country of origin
> of a bearing.
>
> Bearings are sold both to OEMs and to distributors

and other aftermarket customers.  Data gathered in the course of these reviews indicate that subject imports compete for OEM sales; in fact, a higher share of imports are sold to OEMs (over 96 percent) than are domestically produced [ball bearings] (79.1 percent).

Subject imports from each of the six countries have been present continuously in the [United States] market and have been sold throughout the [United States] market.

[The Commission] therefore f[ou]nd that there would likely be a reasonable overlap of competition between the subject imports and the domestic like product, and among the subject imports themselves, if the orders were revoked.

Final Determination, USITC Pub. 3309, Vol. 1 at 35-36 (citations

omitted).


Finally, the Commission explained its finding that there were

no significant differences in the conditions of competition among

the subject countries by stating:

The volume and price trends varied for subject imports from all six countries and none was distinct from all others.  Subject producers from Japan have argued that conditions of competition facing subject imports from Japan are different from those facing other subject imports, most notably in the significant investment in [United States] production facilities made by Japanese-owned producers.  However, [the Commission] do[es] not find that any of the conditions of competition differ significantly among the six countries.  Notably, producers in each of the six subject countries also have investments in [United States] production or are related to domestic producers.

[The Commission] therefore find[s] that subject imports from these countries would compete in the [United States] market under similar conditions of competition.

Final Determination, USITC Pub. 3309, Vol. 1 at 36 (citations

omitted).

   B.   **Cumulation of Subject Imports from Singapore**

       1.   **NMB's Contentions**

   NMB argues that the Commission's cumulation of the subject imports from Singapore with other subject imports was contrary to law and unsupported by substantial evidence. See Mem. P & A Supp. Mot. Pls. NMB J. Agency R. ("NMB's Mem.") at 12-61. In particular, NMB contests the cumulation methodologies used by Chairman Koplan, Commissioners Bragg and Miller, and the conclusions reached by the Commission regarding cumulation of the subject imports from Singapore with other subject imports. See id.

   First, with respect to the cumulation methodologies used by the various Commissioners, NMB maintains that: (1) Commissioner Bragg's two-step aggregate approach to determine whether there is discernible adverse impact is contrary to law because "[t]he statute and SAA provide absolutely no authority for the Commission to cumulate imports from a particular country when that country's imports alone would have no discernible adverse impact[,]"[25] id. at

_____

   [25] Commissioner Bragg provided her own cumulation analysis in the Final Determination and referred to Potassium Permanganate from China and Spain, Inv. Nos. 731-TA-125-126 (Review), USITC Pub. 3245 at 27-30 (Oct. 1999), for a complete discussion of the analytical framework she employs to assess cumulation. See Final Determination, USITC Pub. 3309, Vol. 1 Bragg's Views at 65 n.1. In Potassium Permanganate from China and Spain, Commissioner Bragg stated that:

   in a grouped sunset review, even if imports from each of
                                                    (continued...)

15; and (2) Chairman Koplan and Commissioners Miller and Bragg
failed to discuss any factor relating to impact such as competition
and causation issues.  See id. at 21; see also id. at 20-26.[26]

Next, NMB contests the conclusions reached by the Commission
regarding cumulation of the subject imports from Singapore with
other subject imports by arguing that the Commission's "discernible
adverse impact" determination and the Commission's finding of "a
reasonable overlap of competition" between imports from Singapore
and the domestic like product were not supported by substantial
evidence and were not in accordance with law.  See NMB's Mem. at
15-19, 26-51.

With respect to the Commission's "discernible adverse impact"
determination, NMB argues that: (1) "Commissioner Bragg failed to
recognize, discuss, or analyze the distinct nature of the miniature

_____

[25](...continued)
        several subject countries are likely to have no
        discernible adverse impact on the domestic industry when
        analyzed individually, economic reality dictates a
        further assessment of whether such imports, in the
        aggregate, are likely to have no discernible adverse
        impact on the domestic industry.

USITC Pub. 3245 at 28.

[26]     In the Final Determination, Chairman Koplan and
Commissioner Miller refer to Malleable Cast Iron Pipe Fittings From
Brazil, Japan, Korea, Taiwan, and Thailand, Inv. Nos. 731-TA-278-
280 (Review) and 731-TA-347-348 (Review), USITC Pub. 3274 (Feb.
2000) for a discussion of their analytical framework regarding the
application of the "discernible adverse impact" provision.
See Final Determination, USITC Pub. 3309, Vol. 1 at 17 n.110.

and small, low-end bearings imported from Singapore and the lack of competition between these bearings and the bearings produced domestically[,]" id. at 17; (2) "Commissioner Bragg . . . failed to point to or discuss any pricing evidence showing that imports from Singapore undersell or would likely undersell the domestic like product after revocation of the order[,]" id.; (3) "Commissioner Bragg failed to identify even a single domestic producer that produced the type of bearings imported from Singapore[,]" NMB's Mem. at 17; (4) Commissioner Bragg failed to consider that in the last three most recent administrative reviews, imports from Singapore were subject to dumping margins of 2.43 percent, 2.10 percent and 5.33 percent, see id. at 18;[27] (5) Chairman Koplan failed to explain how the factors that he considered in making his affirmative discernible adverse impact determination (that is, availability of unused capacity, export orientation of the foreign

---

[27] NMB further argues that in the case at bar, Commissioner Bragg deviated from her views articulated in Brass Sheet and Strip from Brazil, Canada, France, Germany, Italy, Japan, Korea, the Netherlands, and Sweden, Inv. Nos. 701-TA-269 & 270 (Review) and 731-TA-311-317 & 379-380 (Review), USITC Pub. 3290 (Apr. 2000), because she failed to consider whether the subject imports from Singapore "have maintained a steady presence in the [United States] market following imposition of the order and whether revocation would not create an incentive to foreign producers to increase shipments." Reply Br. Supp. Mot. Pls. NMB J. Agency R. ("NMB's Reply") at 21. NMB points out that inter alia, "[t]he record evidence . . . showed that the Singapore producers did not increase shipments to the United States despite low dumping margins at the Department of Commerce, demonstrating that there would be no increased incentive for Singapore producers to increase shipments if the order were revoked." Id. at 21-22.

bearings industry, market presence of imports despite an existing antidumping order and total production levels) were relevant, see NMB's Mem. at 26-27; (6) "[t]he ball bearings industries in both Romania and Sweden had greater 'available capacity' in 1999 than the industry in Singapore[,]" id. at 28;[28] (7) unlike Sweden, "Singapore . . . is not included in the list of top five bearings producers cited by the Commissioners[,]" NMB Mem. at 29; (8) the Commission's reliance on export orientation as a factor to support the affirmative adverse discernible impact with regard to Singapore was arbitrary because "[t]he Commissioners have not explained why such a factor is relevant to an adverse impact analysis" and "NMB . . . demonstrated on the record [that] the Singapore ball bearing industry increasingly is directing its exports to Asian markets[,]" id. at 29-30; (9) the Commission's analysis regarding the market presence factor is flawed because "the decline in volume of both Romanian and Swedish imports under the existing antidumping orders suggests that revocation of the orders would result in a corresponding increase in volumes" whereas "the level of Singapore bearings sold to the [United States] market both prior to and after

---

[28] Chairman Koplan did not cumulate subject imports from Romania and Sweden because he determined there was no discernible adverse impact since the two countries had low levels of unused capacity and low levels of subject imports despite low dumping margins. See Final Determination, USITC Pub. 3309, Vol. 1 at 34. Commissioner Miller cumulated subject imports from Romania but did not cumulate subject imports from Sweden. See id. at 90. Commissioner Bragg cumulated subject imports from Romania and Sweden. See id. at 65.

the order has remained small and steady despite the existence of an antidumping order, suggesting that demand is steady and unaffected by a dumping margin[,]" NMB Mem. at 31-32; and (10) "[Chairman] Koplan singles out Romanian bearings as not pre-certified for OEM customers in the [United States] market" but fails "to explain why he did not give equal consideration to the fact that, because Singapore bearings are only non-precision, low-end, miniature or small ball bearings, they necessarily would be certified only for low-end applications, not for the applications required of domestic or other subject imported bearings." Id. at 33.

With respect to the Commission's finding of a "reasonable overlap in competition" between Singapore subject imports and other subject imports and the domestic like product, NMB contends that: (1) the Commission erroneously believed that NMB's sister company in the United States "imported and shipped bearings from Singapore" and, therefore, the Commissioners erroneously "lump Singapore in with all of the other countries and lump [NMB's sister company] in with all of the other domestic producers in [the Commission's] conclusion that domestic producers are able to complement their [United States] production with subject imports[,]" NMB Mem. at 40, see also id. at 36-40; (2) "[Chairman] Koplan based his cumulation analysis on the mistaken assumption that 'parties favoring revocation agree that [ball bearings] are the most commodity-like product of the four products in these reviews[,]'" NMB Mem. at 40

(quoting Final Determination, USITC Pub. 3309, Vol. 1 at 35 (citing in turn Timken Posthearing Br. at 8: Tr. at 345-46));[29] (3) the Commission erred in finding that subject imports from Singapore were fungible with the domestic like product and with other subject imports because "[b]all bearings from Singapore are physically distinguishable from domestic bearings and other subject imports" since "[t]hey consist of non-precision, low-end, mass-produced, miniature and small bearings with limited ABEC precision tolerance ranges that the [United States] producers and other subject foreign producers do not sell in noticeable quantities in the [United States] market[,]" NMB's Mem. at 42-43;[30] (4) the Commission's analysis regarding fungibility is in error because the Final

[29] NMB argues that "Mr. Malmstrom, whom the Commissioners cited to for support in their Opinion, actually indicated that tapered roller bearings were as commodity-like as ball bearings." NMB Mem. at 41 (citing Pl's App. Mem. P & A Supp. Mot. J. Agency R. ("NMB's App.") 9 at 346). Additionally, NMB maintains that despite Chairman Koplan's and Commissioner Bragg's suggestion that the parties favoring revocation agreed that ball bearings are the most commodity-like of the four products in these reviews, "parties favoring revocation directly disputed the notion that ball bearings were commodity products and that ball bearings were the most commodity-like of the products under review." NMB's Mem. at 41.

[30] NMB points out that "the imports from Singapore are sold for different end-uses in different market segments and are sold through different channels of trade than domestic bearings and subject imports from the other countries." NMB's Mem. at 43. Moreover, NMB maintains that Commissioner Hillman "found evidence that the miniature bearings imported from Singapore 'are not produced domestically in any significant quantities,' and, further, that 'the record contains no firm evidence to the contrary.'" Id. at 43-44 (quoting Final Determination, USITC Pub. 3309, Vol. 1 at 105.

Determination, USITC Pub. 3309, Vol. 2 at Tbl. BB-II-3, "alleges that 9 purchasers reported imports from Singapore as being interchangeable with the domestic like product . . . [while] the questionnaire responses of the purchasers show that only 8 purchasers actually reported the products as interchangeable[,]" NMB's Mem. at 46; (5) "[i]t was error for the Commissioners to have based their conclusion on interchangeability of the Singapore bearings on [a certain number of responses that included purchasers that did not purchase ball bearings imports from Singapore] rather than only the [certain number of] purchasers" who had purchased ball bearing imports from Singapore, id. at 46-47; and (6) the Commission "failed to consider interchangeability between the subject imports from Singapore and the subject imports from other subject countries." Id. at 47; see also id. at 48-51.

Additionally, NMB asserts that the Commission misapplied the statutory term "likely", "essentially basing its cumulation determination on merely 'possible' competition." Id. at 56. In particular, NMB maintains that "if the evidence of competition for cumulation is evenly split or inconclusive, competition cannot be deemed 'likely' [under 19 U.S.C. § 1675a(a)(7)]."[31] Id. at 54.

---

[31] NMB further asserts that the Commission also misapplied the statutory term "likely" as it pertains to the Commission's determination of whether revocation of an antidumping duty order "would be likely to lead to continuation or recurrence of material

(continued...)

### 2.   Commission's Contentions

First, with respect to the cumulation methodologies used by the various Commissioners, the Commission responds that: (1) although Commissioner Bragg may have employed a two-step aggregate approach to determine whether there is no discernible adverse impact in other reviews, in the review at issue "Commissioner Bragg clearly and unequivocally stated that because she found that revocation of 'each of the [ball bearing] orders, individually, would be likely to result in a discernible adverse impact to the domestic industry,' she did not reach the second stage of her cumulation analysis,"[32] Def.'s Mem. at 49 (quoting Final Determination, USITC Pub. 3309, Vol. 1 Bragg's Views at 70; and (2) "[t]he Commission's findings regarding the likelihood of a discernible adverse impact must be understood in light of its

---

[31](...continued)
injury to an industry in the United States within a reasonably foreseeable time." NMB's Mem. at 53 (citing 19 U.S.C. § 1675(c)(1)); see also NMB's Reply at 24-28.

[32]   The Court will not render a decision as to whether Commissioner Bragg's second stage (that is, to determine whether all subject imports not likely to have a discernible adverse impact individually would have a discernible adverse impact cumulatively) is in accordance with law because Commissioner Bragg did not reach the second stage of her two-step cumulation methodology in the Final Determination. See Final Determination, USITC Pub. 3309, Vol. 1 Bragg's Views at 70 ("Because I find that revocation of each of the [ball bearing] orders, individually, would be likely to result in a discernible adverse impact to the domestic [ball bearing] industry, I do not reach the second stage of my cumulation analysis.") (Emphasis supplied).

findings regarding the conditions of competition[]" and, therefore, Chairman Koplan and Commissioners Miller and Bragg did address factors relating to impact during their discernible adverse impact analysis. See id. at 54-55.

Next, the ITC argues that the Commission's discernible adverse impact determination was supported by substantial evidence and was in accordance with law. See id. at 49-60. In particular, the Commission maintains that: (1) Commissioner Bragg based her discernible adverse impact determination on a country-by-country basis and "[i]n Singapore's case, Commissioner Bragg was persuaded by the substantial total production capacity, the amount of unused capacity, and the . . . export orientation of Singapore producers[,]" id. at 49; (2) NMB misconstrues Commissioner Bragg's previously articulated views regarding her discernible adverse impact determination because in Brass Sheet and Strip from Brazil, Canada, France, Germany, Italy, Japan, Korea, the Netherlands, and Sweden, USITC Pub. 3290 at 27-28, "Commissioner Bragg clearly stated that she would require not only that the order have had little effect on subject imports but also that revocation would similarly be likely to have no effect[,]"[33] Def.'s Mem. at 50; (3)

_____

[33] The Commission maintains that "Commissioner Bragg simply did not find that revocation would be likely to have no effect on subject imports." Def.'s Mem. at 51. "Commissioner Bragg specifically noted the presence of substantial and unused capacity and the . . . export orientation of the industry in Singapore as
(continued...)

contrary to NMB's argument that Commissioner Bragg failed to
recognize, discuss or analyze the particular nature of subject
imports from Singapore, "[a] Commissioner is not obligated to
acknowledge or discuss every piece of information on the record .
. . [but] [r]ather, a Commissioner must examine the relevant data
and articulate an explanation for her determination[,]" id. at 52
(citing Taiwan Semiconductor Industry Assoc. v. United States, 24
CIT 220, 237, 105 F. Supp. 2d 1363, 1378-79 (2000)); (4) contrary
to NMB's argument that Commissioner Bragg failed to identify even
one domestic producer that produced the type of bearings imported
from Singapore, "[t]he Commission is not required to determine
which individual producers are likely to feel the impact[,]" Def.'s
Mem. at 52 (citing Minebea Co. v. United States, 16 CIT 550, 554,
794 F. Supp. 1161, 1165 (1992)); (5) "[a] review of the evidence
upon which the Chairman relied reveals that the factors which
favored not cumulating Romania and Sweden did not similarly favor
not cumulating subject imports from Singapore[,]"[34] Def.'s Mem. at

───────────────

[33](...continued)
evidence indicating that revocation would lead to an adverse
discernible impact on the domestic industry." Id. Moreover, the
Commission argues that NMB is merely seeking to have this Court
substitute its own evaluation of the evidence for that of the
Commission's. See id.

[34] The Commission points out that Singapore is different than
the non-cumulated countries of Romania and Sweden in that:

[w]hile Plaintiff NMB complains that the percentage of
available unused capacity was [a certain percent] in both

(continued...)

55-56; (6) contrary to NMB's argument that the Commission's reliance on export orientation as a factor to determine discernible adverse impact is arbitrary, the export orientation factor is relevant because "[f]oreign producers with little or no domestic market to rely upon must export. This economic imperative is particularly acute in an industry such as ball bearing production, which is capital-intensive and typically requires high levels of capacity utilization for profitability[,]" id. at 57 (citing Def.'s Mem., App. Vol. 1, Doc. No. 140 ([Timken]'s Post-Hearing Br. and Resps. to Commissioner's Questions) at 1-2 (confidential version); (7) "the [United States] market was substantially more important to producers in Singapore" than producers from Romania and Sweden because exports to the United States from Singapore accounted for

---

[34](...continued)
Sweden and Romania, the actual volume of unused capacity in Singapore was [not analogous to Sweden and Romania]. Moreover, the total value of subject imports from Singapore grew between 1985-87 and 1997-98, sufficient to ensure a constant share of the total [United States] market, despite an overall increase in total imports from all sources in the [United States] market. The share of total domestic consumption by value accounted for by subject imports from Singapore was essentially unchanged, ranging from 1.3 percent to 1.4 percent in 1985-87, 1.4 percent in 1997, and 1.3 percent in 1998. Conversely both the share and volume of subject imports by value from Romania and Sweden declined both relatively and absolutely between 1985-87 and 1997-98. Romania and Sweden each accounted for only 0.1 percent of total domestic consumption.

Def.'s Mem. at 56 (citing Final Determination, USITC Pub. 3309, Vol. 2 at Tbl. BB-I-1).

a greater percentage of all shipments by Singapore in 1998 than the percentage of all shipments by Romania and Sweden, and "[w]hen gauged in volume terms, the differences between Singapore on the one hand and Romania and Sweden on the other become even sharper[,]" Def.'s Mem. at 57-58 (citing Def.'s Mem., App. Vol. 1, Doc. No. 167 at Tbls. BB-IV-7 - BB-IV-9 (confidential version)); and (8) contrary to NMB's assertion that there is no difference between pre-certified OEM sales and non-certified OEM sales, "OEM sales, which typically require certification, are important because of the large volumes typically associated with such sales . . . [and] subject imports from Singapore were sold directly to OEMs, indicating that subject imports from Singapore had no trouble entering a market where certification requirements are the norm." Def.'s Mem. at 58.

The ITC further argues that the Commission's finding of a reasonable overlap in competition between subject imports from Singapore and other subject imports and the domestic like product was supported by substantial evidence and was in accordance with law. See id. at 47-48, 58-63. Specifically, the Commission maintains that: (1) Commissioner Bragg properly considered evidence that weighed for and against a finding of a reasonable overlap in competition, see id. at 47-48 (citing Final Determination, USITC Pub. 3309, Vol. 1 Bragg's Views at 68); (2) "NMB does not explain how it was harmed by the Commission's error, which only involved

whether [NMB's sister company] was an importer, not whether [NMB's sister company] was related to ball bearing manufacturers in Singapore that shipped ball bearings to the United States[,]" Def.'s Mem. at 59;[35] (3) contrary to NMB's contention, Mr. Malmstrom, "clearly stated that tapers [tapered roller bearings] were 'second,' in other words, less of a commodity than ball bearings[,]" id. at 61 (citing Def.'s Mem., App. Vol. 1, Doc. No. 710 at 345-46); (4) Table BB-II-3 was not incorrect as alleged by NMB since "nine, not eight, purchasers gave their opinion regarding the interchangeability of subject imports from Singapore and the domestic like product[,]" Def.'s Mem. at 61-62 (citing Def.'s Mem., App. Vol. 2, Doc. Nos. 767, 770, 771, 773, 775, 778, 788, 792, 811 (confidential version)); and (5) contrary to NMB's argument that the Commission should have based its conclusions of interchangeability of the Singapore bearings on the number of purchasers who had purchased ball bearing imports from Singapore rather than on the responses of purchasers who had not purchased

---

[35] In its reply brief, NMB contends that the Commission and Timken concede to the Commission's incorrect finding that NMB's sister company imported ball bearings from Singapore. See NMB's Reply at 2. NMB asserts that "[t]he Commission's error resulted in the improper decision to cumulate Singapore bearings based on [the Commission's] flawed understanding that they were interchangeable with other [certain quality] imported and domestic bearings." Id. at 3. NMB maintains that "[a]t minimum, a remand is required for the Commission to consider whether Singapore bearings are interchangeable in light of the accurate understanding that [NMB's sister company did not import or sell ball bearings from Singapore]." Id. at 7; see also id. at 3-7.

ball bearing imports from Singapore, "[t]he Commission has not generally required purchasers to have actually purchased a specific subject import in order to provide information in response to the Commission's questionnaire. The record contains no evidence to indicate that purchasers answered questions outside their knowledge." Def.'s Mem. at 62-63.

Finally, the Commission contends that it used the proper legal standard with respect to the statutory term "likely." See id. at 81-83. Specifically, the Commission asserts that NMB's construction of the term 'likely' to mean probable "is in direct conflict with the intent and meaning of the SAA expressly adopted by Congress." Id. at 82. In support of its argument, the Commission states:

> The determination called for in these types of reviews is inherently predictive and speculative. There may be more than one likely outcome following revocation or termination. The possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of dumping or countervailable subsides, or injury, is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonable in light of the facts of the case. In such situations, the order or suspended investigation will be continued.

Def.'s Mem. at 82 (quoting H.R. Doc. No. 103-316, at 883). The Commission further states "[t]hat more than one likely outcome is possible can only mean that Congress did not intend the word 'likely' to have the meaning ascribed to it by [NMB]" Def.'s Mem. at 82, and "[t]he Commission made its determination based on what

its interpretation of the evidence indicated were the 'likely'
outcomes."[36]  Id. at 83.


### 3.   Timken's Contentions

Timken generally agrees with the Commission and maintains that
the Commission's decision to cumulate subject imports from
Singapore with other subject imports was in accordance with law and
supported by substantial evidence.  Timken's Resp. at 23-35.  In
particular, Timken argues that: (1) the Commission "in deciding
that imports from Singapore would have a discernible adverse
impact, did not limit [its] analysis to import volume[,]" id. at
27; (2) the arguments presented by NMB to contest the Commission's
finding of discernible adverse impact are an invitation by NMB for

------

[36]  In its reply brief NMB states:

> The Commission's argument that its decision should be
> reviewed solely to determine whether it was supported by
> substantial evidence, would read the term "likely" out of
> the statute [that is, 19 U.S.C. § 1675(c)(1), 19 U.S.C.
> § 1675a(a)] and would violate two well known cannons of
> statutory construction--the canon that legislators are
> presumed to use words deliberately, and the rule against
> surplussage. In its brief, the Commission concedes that
> it did not apply the plain meaning of "likely" on the
> basis that the SAA recognizes that there may be more than
> one likely outcome.  The Commission in essence implies,
> but does not explicitly state, that in order for there to
> be "more than one likely outcome," the term "likely" must
> be interpreted in some lesser manner--to mean, in
> essence, supported by substantial evidence, or
> "possible."   Clearly, there can be more than one
> "possible" outcome.

NMB's Reply at 27 (citations omitted).

the Court to re-weigh the evidence considered by the Commission, see id. at 27-29; (3) the Court does not need to determine whether an error occurred with respect to NMB's sister company because "the Commissioners' determination that reasonable overlap of competition existed among the various imports and the domestic product was not based on any finding regarding the identity of importers of bearings produced in Singapore[,]" id. at 29-30; and (4) NMB's argument regarding the statutory term "likely" should be rejected because "NMB offers no support for its assertions that the Commission applied a different standard; NMB's disagreement is simply with the weight to be accorded to the evidence collected by the Commission." Id. at 35.

### C. Cumulation of Subject Imports from The United Kingdom

#### 1. NSK-RHP's Contentions

NSK-RHP argues that the Commission's cumulation of the subject imports from the United Kingdom with other subject imports was unsupported by substantial evidence. See NSK-RHP's Mot. at 16-19, 44-51; NSK-RHP's Reply at 19-23. Specifically, NSK-RHP contends that "the factual record demonstrates that the Commission should not have cumulated the [United Kingdom ball bearing] industry for reasons similar to its decision regarding the Romanian [ball bearing] industry[,]" NSK-RHP's Mot. at 16, and ball bearing imports from the United Kingdom would not have a discernible

adverse impact on the United States ball bearings industry. See id. at 44-51. NSK-RHP points out that: (1) the subject imports from the United Kingdom are analogous to the subject imports from Romania in that they are "very low and trending downward[,]" that is, "by 1998, Romania's share of subject import[s] had dropped 0.6 percent to 0.1 percent . . . while the [United Kingdom's] share continued its downward trend during interim 1999, dropping to 0.4 percent" from 0.5 percent, id. at 44-45 (citing NSK-RHP's App. 2 at Tbl. BB-I-1); (2) the United Kingdom ball bearing industry had "high capacity utilization rates throughout the review period and" a small excess capacity, NSK-RHP's Mot. at 46; (3) the data regarding excess capacity and all inventories demonstrates that the United Kingdom ball bearings market data is more comparable to the Romanian ball bearings market data than to the market data of the other ball bearing industries that were cumulated, see id. at 47 (citations omitted); (4) the United Kingdom ball bearings industry is comparable to the Romanian ball bearings industry with regard to the United States export orientation ratios, see id. at 47-48; (5) "[t]he size of the [United Kingdom ball bearing] industry . . . differs significantly from the [ball bearing] industries for the cumulated countries[,]" id. at 49; and (6) "[t]he Commission . . . did not mention OEM certification in its decision to cumulate the [United Kingdom ball bearing] industry, nor did it let this factor stop it from not cumulating Sweden's [ball bearing] industry." Id.

at 50.


### 2.    Commission's Contentions

The Commission responds that contrary to NSK-RHP's argument that the record indicates the Commission should not have cumulated the United Kingdom ball bearing industry for reasons similar to its decision regarding the Romanian ball bearing industry, "[s]ubject imports from the United Kingdom possessed a significant advantage over subject imports from Romania."  Def.'s Mem. at 68.  In particular, the Commission points out that: (1) "[s]ubject imports from Romania were not pre-certified for purchase by any OEM purchaser, a significant impediment in a market dominated by sales to OEMs[,]" id. at 68 (citing Def.'s Mem., App. Vol. 1, Doc. No. 167 at BB-II-14 (confidential version); (2) although the United Kingdom ball bearing industry had a higher capacity utilization rate and a smaller excess capacity than that in Romania, "the amount of available unused capacity in the United Kingdom was equivalent [to a certain percentage] of total [United States] domestic production in 1998, and it was equivalent to [a higher] percent for the first nine months of 1999[,]" Def.'s Mem. at 68 (citing Def.'s Mem., App. Vol. 1, Doc. No. 167 at Tbl. BB-IV-10 (confidential version)); (3) "the ball bearings industry in the United Kingdom was less export-oriented than that of Sweden when expressed as a share of total production, but the actual level of

exports, both to the [United States] market and to all other export markets, was much higher[,]" Def.'s Mem. at 69 (citing Def.'s Mem., App. Vol. 1, Doc. No. 167 at Tbls. BB-IV-9 and BB-IV-10) (confidential versions)); and (4) contrary to NSK-RHP's argument that the Commission placed too much weight on the certification issue, "[t]he weight to be given to any particular piece of evidence is left to the Commission as the trier of fact."  Def.'s Mem. at 69-70 (citing Maine Potato Council v. United States, 9 CIT at 300, 613 F. Supp. at 1244).  Moreover, the Commission maintains that its determination that ball bearing imports from the United Kingdom would have a discernible adverse impact was based on substantial evidence.  See Def.'s Mem. at 70-71.

### 3.    Timken's Contentions

Timken generally agrees with the Commission and asserts that "[c]ontrary to NSK's arguments, the Commission determination that imports from the [United Kingdom] are likely to have a discernible adverse impact following revocation is supported by substantial evidence."  Timken's Resp. at 17; see also Timken's Resp. at 17-18.

   D.   **Cumulation of Subject Imports from France, Germany and Italy**

      1.   **SKF's Contentions**

   SKF argues that the Commission's cumulation of the subject imports from France, Germany and Italy with other subject imports was unsupported by substantial evidence and was contrary to law. SKF's Mot. at 2-3, 5-6, 19-25; see also SKF's Reply Defs.' Resps. SKF's Rule 56.2 Mot. J. Agency R. ("SKF's Reply") at 9-15.  In particular, SKF maintains that the Commission ignored "the climate of competition in the domestic [ball bearing] industry[,]" SKF's Mot. at 20, and "[t]he [ball bearings] imported by SKF do not have a discernible [adverse] impact on the domestic industry as a whole."  Id. at 22.

   First, regarding competition in the domestic ball bearing industry, SKF contends that the domestic and foreign ball bearing industry is fragmented and "it is clearly inappropriate to simply lump together all [ball bearings] from all remaining subject countries and declare that what is true for a given dimension and quality of bearing is necessarily true for all other [ball bearings] regardless of whether the [ball bearings] compete in actual use or are in some way 'fungible.'" Id. at 20.  SKF maintains that the question that needs to be answered is whether the "three subject countries [France, Germany and Italy] actually compete with, and cause the same injury as, those [ball bearings]

exported from certain other high-volume exporting countries subject to the orders." Id. at 22; see also id. at 21 (citing Final Determination, USITC Pub. 3309, Vol. 2 at BB-I-1 - BB-I-3).

Second, with respect to SKF's argument of discernible adverse impact, SKF asserts that "imports from those countries in which SKF produces [ball bearings] (namely, France, Germany, and Italy)-- even when taken in the aggregate, amount to no more than a small percentage of total imports, whether measured by value or volume. Standing alone, this small percentage of imports could not have a discernible adverse impact on the fragmented [ball bearing] industry, as the Commissioners decided." SKF's Mot. at 23 (citing Final Determination, USITC Pub. 3309, Vol. 2 at BB-I-1 - BB-I-3, BB-IV-2 and BB-IV-4). Moreover, SKF argues that: (1) ball bearings from France, Germany and Italy should have been treated like ball bearings from Sweden and Romania, see SKF's Mot. at 23-24; (2) the Commission's reliance on the presence of subject imports from France, Germany and Italy in the domestic market as a rationale for cumulation is contrary to law since "bearings, when subject to antidumping duties, are presumed to be fairly traded in the United States." Id. at 24 (citing Algoma Steel Corp. v. United States, 12 CIT 518, 520, 688 F. Supp. 639, 642 (1988), aff'd, 865 F.2d 240 (Fed. Cir. 1989); and (3) "reliance on the mere presence of subject imports to support cumulation does harm to the purpose underlying

the cumulation law, and the sunset process in general."[37]  SKF's

Mot. at 24.


### 2.  Commission's Contentions

The ITC responds that its decision to cumulate subject imports

from France, Germany and Italy with other subject imports on the

basis of a reasonable overlap in competition and a discernible

adverse impact was supported by substantial evidence and was in

accordance with law.  See Def.'s Mem. at 63-67.  First, regarding

the Commission's determination of a reasonable overlap in

competition, the Commission argues that SKF fails to provide

"specific examples of subject imports from France, Germany, or

Italy that do not compete with, and cannot be substituted for, the

domestic like product or other subject imports."  Id. at 64.  The

Commission further argues that the subject imports from France,

Germany and Italy were interchangeable with both the domestic like

product and with the other subject imports, see id. (citing Final

Determination, USITC Pub. 3309, Vol. 2 at Tbl. BB-II-3),  and

---

[37]  SKF argues:

The purpose of sunset reviews is not to find any possible
or conceivable rationale for continuing antidumping or
countervailing duty orders.  Rather, the sunset process,
as devised under the URAA, was put in place to eliminate
orders that are unnecessarily penalizing imports, the
volume and pricing of which no longer pose a threat to
the domestic industry.

SKF's Mot. at 24-25 (emphasis omitted).

"[t]he record also indicated that subject imports from the three countries moved in similar channels of distribution and had been continuously present in the market and sold throughout the [United States], as had other subject imports and the domestic like product." Def.'s Mem. at 64 (citing <u>Final Determination</u>, USITC Pub. 3309, Vol. 1 at 35-36).

Second, with respect to the Commission's determination of a discernible adverse impact, the Commission maintains that: (1) contrary to SKF's argument that subject imports from France, Germany and Italy amount to no more than a small percentage of total imports and, therefore, could not have a discernible adverse impact, "current levels of subject imports and prices alone cannot be determinative, for that evades altogether the fundamental question of what would happen in the event of revocation in the absence of the orders[,]" Def.'s Mem. at 65; (2) the Commission did not consider subject imports from France, Germany and Italy currently in the market as not being fairly traded but did find "that a continuing presence in the [United States] market implied a familiarity with the market that would be advantageous in the event of revocation[,]" <u>id.</u> at 66; (3) "[t]he importance of OEM sales, and the likelihood that OEM sales will require certification, give an advantage to producers [such as SKF] already in the market[,]" <u>id.</u>; and (4) contrary to SKF's assertion that subject imports from France, Germany and Italy were analogous to

subject imports from Romania and Sweden, "[s]ubject imports from France, Germany, and Italy declined from 1985-87 to 1997-98, but market share of subject imports from each of those three countries remained well in excess of the shares held by subject imports from Romania or Sweden." Id. at 67.


### 3.    Timken's Contentions

Timken generally agrees with the Commission and maintains that "contrary to SKF's arguments, the Commission's inclusion of France, Germany and Italy in its cumulative assessment of the likely volume and effect of the imports is supported by substantial evidence and is in accordance with law." Timken's Resp. at 19. With respect to the Commission's determination of a reasonable overlap of competition, Timken argues that contrary to SKF's arguments, "[t]he issue, properly defined . . . is not whether any particular ball bearing competes with all other ball bearings, regardless of size or grade . . . [but] whether the large variety of size and grades of ball bearings imported from each of the subject countries compete with the products imported from other countries and the products offered by the domestic producers." Id. at 19 (citation omitted). Additionally, Timken maintains that the overlap of competition standard only requires a reasonable overlap of competition and not a complete overlap of the markets. See id. at 20 (citing Mukand Ltd. v. United States, 20 CIT 903, 904-05, 937 F.

Supp. 910, 913 (1996)).

Next, with respect to the Commission's determination of a discernible adverse impact, Timken contends that the Commission's determination was supported by substantial evidence, Timken's Resp. at 20-21, and "the Commission lawfully relied on the presence of imports in [the] current market to support its determination that the imports are likely to have a discernible adverse impact."[38] Id. at 21; see also id. at 21-22.

### E.    Cumulation of Subject Imports from Japan

#### 1.    NTN's Contentions

NTN argues that the Commission's cumulation of subject imports from Japan with other subject imports was unsupported by substantial evidence and was contrary to law. See NTN's Mot. at 4, 11-12, 32-37. In particular, NTN argues that the Commission's reasons for determining that subject imports from Japan are likely to have a discernible adverse impact if taken "alone, or . . . in conjunction with one another, are not enough to provide the

---

[38]   In its reply brief, SKF argues that "SKF does not assert that the Commission should ignore current conditions. To the contrary, SKF alleges that the Commission erred in disregarding current conditions in favor of unsubstantiated conjecture as to the future." SKF's Reply at 14.

necessary link to show likely discernible adverse impact."[39]  Id. at 34.  NTN further argues that the Commission's finding of a reasonable overlap in competition between Japanese subject imports and other subject imports and the domestic like product is not supported by substantial evidence because: (1) "[r]ecord evidence shows that ball bearings are not significantly more commodity-like than other types of bearings[,]" NTN's Mot. at 35; and (2) "for many OEM sales, United States produced ball bearings and Japanese-produced ball bearings are not interchangeable," id. at 35. Finally, regarding the Commission's determination that there were not any significant differences in the conditions of competition among the subject countries, NTN argues that "the ITC virtually ignores the enormous investment by Japanese firms in [United States] production facilities as compared with the much smaller amounts of investments by firms in other subject countries." Id. at 35-36.

### 2.    Commission's Contentions

In response to NTN's arguments, the Commission maintains that: (1) the Commission properly relied on the factors that it used to

---

[39]  NTN provides an example of the Commission's alleged missing necessary link to show likely discernible adverse impact by stating that "the fact that a company has available production capacity only means that it may produce additional merchandise; it in no way suggests that that merchandise will have an adverse impact on a foreign market."  NTN's Mot. at 34.

determine that subject imports from Japan are likely to have a discernible adverse impact because these factors were relevant to the conditions of the Untied States ball bearing market, see Def.'s Mem. at 73;[40] and (2) contrary to NTN's arguments regarding the Commission's finding of a reasonable overlap in competition, "perfect overlap is not required" and "even assuming . . . that NAFTA certifications are as important as . . . NTN argues, that still leaves a significant portion of subject imports and domestic like product that would otherwise be interchangeable." Id. at 74-75.

### 3. Timken's Contentions

Timken generally agrees with the Commission and contends that "injury determination in a sunset determination is inherently

---

[40] The Commission explains the use of its factors to determine discernible adverse impact by stating:

> Continued presence meant ongoing contact by foreign producers with large-volume OEM manufacturers and their certification requirements. Unused capacity meant capacity available for additional export production. Export orientation meant an industry was forced to look to outside markets for a significant portion of its sales, an important factor in an industry with high capital costs and a need for high capacity utilization rates.

Def.'s Mem. at 73.

predictive and speculative."[41]  Timken's Resp. at 9 (citing H.R.
Doc. No. 103-316, at 883).  Moreover, Timken asserts that the
Commission's determination regarding a reasonable overlap of
competition "is supported by overwhelming evidence of record
indicating that imports from Japan, other imports and domestic
products are substitutable, are offered in the same geographic
market, are sold through the same channels, and are simultaneously
present in the market."  Timken's Resp. at 10 (citations omitted).


### F.    Cumulation of Subject Imports from Italy and the United Kingdom

#### 1.    FAG's Contentions

FAG asserts that "[t]he Commission's decision to cumulate
imports of ball bearings from Italy and the United Kingdom was
contrary to the intent of 19 U.S.C. § 1675a(a)(7) because Congress
intended to preclude the Commission from cumulating imports at
negligible levels."  Pl.-Interv.'s Rule 56.2 Mot. J. Agency R.
("FAG's Mot.") at 2.  Specifically, FAG maintains that the standard
of determining whether imports are "negligible" under 19 U.S.C. §
1677(24)(A)(i) (1994),[42] should be considered by the Commission in

---

[41]    NTN argues that "contrary to [Timken's] assertions, the
predictive and speculative nature of sunset reviews does not
relieve the ITC of its obligation to clearly explain the bases for
its determination."  NTN's Reply at 4.

[42]    Title 19 of Section 1677(24)(A)(i) provides in pertinent
(continued...)

its cumulation analysis to determine whether imports from Italy and the United Kingdom have a "discernible adverse impact." See id. at 8-10. FAG further maintains that the application of the negligibility standard under 19 U.S.C. § 1677(24)(A)(i) to the Commission's cumulation analysis comports with URAA changes in the dumping law and, therefore, "if the [cumulation] statute prohibits the Commission from finding that imports of less than 3 percent may cause material injury, it would be inconsistent to find that the same negligible import levels cause an 'adverse negative impact' to the domestic industry." Id. at 9 (citing Florida Sugar Mktg. & Terminal Ass'n v. United States, 220 F.3d 1331, 1337 (Fed. Cir. 2000). Applying the negligibility standard of 19 U.S.C. § 1677(24)(A)(i), FAG contends that "[i]n the instant case, the record shows that imports of ball bearings from Italy and the United Kingdom fall well below the 3 percent standard for 'negligible imports.'" FAG's Mot. at 9.

FAG also argues that the Commission's cumulation of the subject imports from Italy and the United Kingdom with other

---

[42](...continued)
part:

> imports from a country of merchandise corresponding to a domestic like product identified by the Commission are "negligible" if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period . . . .

subject imports on the basis that subject imports from Italy and the United Kingdom would have a discernible adverse impact on the domestic industry if the orders were revoked was unsupported by substantial evidence. See FAG's Mot. at 10-16. In particular, FAG points out that: (1) the import volume of ball bearings from Italy and the United Kingdom were comparable to the import volume of ball bearings from the non-cumulated countries of Sweden and Romania, see id. at 11-12 (citing App. Pl.'s Br. Supp. R. 56.2 Mot. ("FAG's Mot. App.") at 5, Tbl. BB-IV-1 (confidential version)); (2) imports from Italy and the United Kingdom accounted for a certain percentage of United States consumption that was comparable to the non-cumulated countries of Sweden's and Romania's percentage of United States consumption, FAG's Mot. at 13-14 (citing FAG's Mot. App. 3, Tbl. BB-I-1 (confidential version)); (3) since Italy's and the United Kingdom's import penetration levels are similar to Romania's import penetration levels, and Italy's and the United Kingdom's capacity utilization rates are considerably higher than Romania's capacity utilization rates, "the Commission's decisions that imports from Italy and the United Kingdom would have a discernible adverse impact on the domestic industry should the orders be revoked, while the imports from Romania would not, are in irreconcilable conflict[,]" FAG's Mot. at 14; and (4) the Italian and United Kingdom producers have affiliated producers in the United States and it is therefore less likely that subject imports

from Italy and the United Kingdom would have a discernible adverse impact on the domestic industry. See id. at 14-15 (citing Final Determination, USITC Pub. 3309, Vol. 2 at Tbl. BB-I-11 (confidential version)).

### 2. Commission's Contentions

In response to FAG's argument that the Commission should apply the negligiblity standard under 19 U.S.C. § 1677(24)(A)(i) to the Commission's cumulation analysis, the Commission maintains that FAG "overlooks the distinctions between the negligibility determination the Commission makes in an original investigation and the determination it must make in the course of a five-year review." Def.'s Mem. at 72. The Commission further maintains that "[i]f Congress had wished to adopt a bright-line, three-percent test for negligibility in five-year reviews, it could have imposed such a test . . . [but] did not do so." Id. (citing H.R. Doc. No. 103-316, at 883).[43]

---

[43] In its reply brief, FAG "admits that a strict numerical test does not apply to the discernible adverse impact analysis[,]" Reply Br. Supp. FAG's Rule 56.2 Mot. J. Agency R. ("FAG's Reply") at 2, but "the three percent standard present in 19 U.S.C. § 1677(24)(A)(i) should be used as a benchmark or guiding principle in assessing the negligibility of imports in the subject sunset reviews." Id. at 3.

### 3.    Timken's Contentions

Timken agrees with the Commission and argues that the Commission's cumulation of subject imports from Italy and the United Kingdom with other subject imports was supported by substantial evidence and was in accordance with law. See Timken's Resp. at 12-16.  Timken argues that: (1) FAG's arguments regarding the United Kingdom should be disregarded because "FAG did not intervene in the appeal regarding the [United Kingdom] filed by NSK-RHP (Ct. No. 00-07-00374),"[44] id. at 12; (2) contrary to FAG's argument that the Commission should apply the negligibility standard under 19 U.S.C. § 1677(24)(A)(i) to the Commission's cumulation analysis, "Congress expressly rejected a numerical standard to determine whether imports were not likely to have any discernible adverse impact[,]" id. at 13 (citing H.R. Doc. No. 103-316, at 883); and (3) the "ITC's decision to include Italian and [United Kingdom] imports in its cumulative assessment of subject imports was supported by substantial evidence."  Timken's Resp. at 14; see also id. at 14-16.

---

[44]  FAG points out that "FAG's motion to intervene in case 00-07-00374 was granted on October 2, 2000."  FAG's Reply at 1 (citing Ex. A).  The Court notes that the order FAG points to granted a consent motion to intervene filed by The Barden Corporation (U.K.) Limited and The Barden Corporation.  Although FAG refers to FAG and The Barden Corporation as "collectively FAG" in its 56.2 motion and reply brief, it is not accurate for FAG to argue that it intervened in case 00-07-00374.  See FAG's Mot. at 1; see also FAG's Reply at 1.  Therefore, FAG's arguments regarding the United Kingdom will not be considered by this Court.

G.   Analysis: The Commission's Cumulation of Subject Imports
     of Ball Bearings from France, Germany, Italy, Japan,
     Singapore and the United Kingdom

The parties have raised numerous issues regarding the Commission's cumulation of the subject imports, but before the Court can consider these issues, the Court must first determine whether the Commission used the proper legal standard with respect to the statutory term "likely."[45]  In Usinor Industeel, the Court found that the language of 19 U.S.C. § 1675 "is clear . . . [and that] 'likely' means 'likely'--that is, probable."  Usinor Industeel, 2002 Ct. Intl. Trade LEXIS 41, at *20 (citing Chevron, 467 U.S. 842-43); see also Nippon Steel Corp. v. United States, 2002 Ct. Intl. Trade LEXIS 152, at *11, Slip Op. 02-153 (Dec. 24, 2002) ("The Court finds that likely means probable within the context of 19 U.S.C. §§ 1675(c) and 1675a(a)."); AG der Dillinger Huttenwerke v. United States, 2002 Ct. Intl. Trade LEXIS 107, at *28 and n.14, Slip Op. 02-107 (Sept. 5, 2002) (finding in a countervailing duty sunset review determination that "it is not sufficient for Commerce merely to indicate the possibility that benefits could still be given under the [subsidy] program.  Rather, Commerce must make factual findings that would indicate whether

---

[45]  "The 'likely' standard is applied in several sunset review analyses." Usinor Industeel, S.A. v. United States, 2002 Ct. Intl. Trade LEXIS 151, at *5 n.2, Slip Op. 02-152 (Dec. 20, 2002) (citing 19 U.S.C. §§ 1675a(a)(1), 1675a(a)(2), 1675a(a)(3), 1675a(a)(4), 1675a(a)(7)).

such benefits would be probable" or "more likely so than not");
Usinor v. United States, 2002 Ct. Intl. Trade LEXIS 98, at *71,
Slip Op. 02-70 (July 19, 2002) ("'likely' is tantamount to
'probable,' not merely 'possible.' Under the standard articulated
in Chevron, the court concludes that the meaning of the term is
clear and terminates its inquiry there." (Citations omitted).

In the case at bar, the Commission in the Final Determination,
USITC Pub. 3309, did not expressly state which standard of the term
"likely" it applied with respect to its cumulation analysis under
19 U.S.C. § 1675a(a)(7) and its likelihood of material injury upon
revocation analysis under 19 U.S.C. § 1675a(a)(1).[46]  However, the

_____

[46] Section 1675a(a)(1) of Title 19 provides in pertinent part:

    In a review conducted under section 1675 . . . (c)
of [Title 19], the Commission shall determine whether
revocation of an order . . . would be likely to lead to
continuation or recurrence of material injury within a
reasonably foreseeable time.  The Commission shall
consider the likely volume, price effect, and impact of
imports of the subject merchandise on the industry if the
order is revoked . . . .  The Commission shall take into
account--

    (A) its prior injury determinations, including the
volume, price effect, and impact of imports of the
subject merchandise on the industry before the order was
issued . . . ,

    (B) whether any improvement in the state of the
industry is related to the order . . . ,

    (C) whether the industry is vulnerable to material
injury if the order is revoked . . . , and

(continued...)

Commission in its brief to the Court states that "NMB's construction of [the term likely to mean probable] . . . is in direct conflict with the intent and meaning of the SAA expressly adopted by Congress." Def.'s Mem. at 82. Additionally, relying on the SAA, H.R. Doc. 103-316, at 883, the Commission states that "[the] more than one likely outcome is possible [language in the SAA] can only mean that Congress did not intend the word 'likely' to have the meaning ascribed to it by [NMB]," id. at 82, and "[t]he Commission made its determination based on what its interpretation of the evidence indicated were the 'likely' outcomes." Id. at 83.

Given that this Court finds that "likely" means probable within the context of 19 U.S.C. § 1675(c) and 19 U.S.C. § 1675a(a), the Court finds that the Commission did not use the proper legal standard with regard to the statutory term "likely." In light of this finding, it would be premature for the Court to address the substantial evidence arguments raised by the plaintiffs in this action (that is, NMB, NSK-RHP, SKF, NTN and FAG) with respect to the Commission's cumulation determination and the Commission's likelihood of material injury upon revocation determination in

----

[46](...continued)
     (D) in an antidumping proceeding under [19 U.S.C. § 1675(c)] . . . , the findings of the administering authority regarding duty absorption under [19 U.S.C. § 1675(a)(4)] . . . .

19 U.S.C. § 1675a(a)(1)(A)-(D).

general.  Accordingly, the Court remands this issue to the ITC to:
(1)(a) apply this Court's finding as to the meaning of the term
"likely" in determining, pursuant to 19 U.S.C. § 1675a(a)(7),
whether to cumulate subject imports of ball bearings from France,
Germany, Italy, Japan, Singapore and the United Kingdom;[47] (b)
reconcile the error alleged by NMB with respect to NMB's sister
company, if the Commission utilizes NMB's sister company in the
Commission's cumulation determination; and (c) apply this Court's
finding as to the meaning of the term "likely" in determining,
pursuant to 19 U.S.C. § 1675a(a)(1), whether revocation of
antidumping duty orders on  ball bearings from France, Germany,
Italy, Japan, Singapore and the United Kingdom, would likely lead
to continuation or recurrence of material injury.

---

[47]   The Court finds that contrary to FAG's argument, the
Commission does not need to utilize the negligibility standard
under 19 U.S.C. § 1677(24)(A)(i) during the Commission's cumulation
analysis.  The Senate Report on the URAA provides in pertinent
part:

> The Committee believes that it is appropriate to preclude
> cumulation where imports are likely to be negligible.
> However, the Committee does not believe that it is
> appropriate to adopt a strict numerical test for
> determining negligibility because of the extraordinary
> difficulty in projecting import volumes into the future
> with precision.

S. Rep. 103-412 at 51 (emphasis supplied); see also Neenah Foundry
Co. v. United States, 25 CIT ___, ___ 155 F. Supp. 2d 766, 776-77
(2001).

**CONCLUSION**

This case is remanded to the Commission to: (1) explain how commodity-like the Commission deems the other antifriction bearings; and (2)(a) apply this Court's finding as to the meaning of the term "likely" in determining, pursuant to 19 U.S.C. § 1675a(a)(7), whether to cumulate subject imports of ball bearings from France, Germany, Italy, Japan, Singapore and the United Kingdom, (b) reconcile the error alleged by NMB with respect to NMB's sister company, if the Commission utilizes NMB's sister company in the Commission's cumulation determination, and (c) apply this Court's finding as to the meaning of the term "likely" in determining, pursuant to 19 U.S.C. § 1675a(a)(1), whether revocation of antidumping duty orders on ball bearings from France, Germany, Italy, Japan, Singapore and the United Kingdom would likely lead to continuation or recurrence of material injury.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE


Dated:     September 3, 2003
           New York, New York